491 A.2d 270

**Carol A. MILLER**

v.

**Mark KRINER, Appellant.**

Superior Court of Pennsylvania.

Argued Oct. 3, 1984.

Filed April 12, 1985.

George N. Daghir, Saint Marys, for appellant.

Vernon D. Roof, Ridgway, for appellee.

Before BROSKY, TAMILIA and ROBERTS, JJ.

BROSKY, Judge:

This case is before us on appeal from the order of the lower court imposing upon appellant a duty of support and ordering him to pay costs, subsequent to a jury's determination that appellant was the father of appellee's child. We find no merit to appellant's arguments, and, accordingly, we affirm.

Appellant first argues that he should be granted a new trial because the lower court refused to permit him to impeach the credibility of expert witnesses by using the results of H.L.A.[1] blood tests which had been performed on his brother, Michael, and which indicated that Michael had a slightly higher (.02%) likelihood of paternity. Immediately prior to commencement of the trial, by motion in limine, appellee's counsel challenged appellant's right to introduce the results of the blood tests which had been performed on appellant's two brothers. The lower court ruled that the results of the tests might be relevant during cross-examination of expert witnesses concerning effectiveness or lack of certainty of the tests, but that the test results had to be used "in the third-party sense," challenging the test "not by way of name of Brother Scott or Brother Michael." In fact, appellant's counsel cross-examined one of the expert witnesses in detail concerning hypothetical brothers who had similar test results (using the same results as were actually obtained from appellant and his brother Michael), as follows:

Q. Let's talk about blood types. For example, supposing that my brother was accused of being the putative father and I went and—he went to your laboratory, and he came off with a plausibility of paternity of 99.17

1. Human Leukocyte Antigen (H.L.A.).

percent and a paternity index of 120 to 1 like we have in this case, and then I came to you and said, "Mr. Houtz, will you take my blood test and run it through the same system that you have run this thing through," and you came up with the results in my case of not only 120 to 1, but 122 to 1, and you came up with the results of plausibility of paternity of not only 99.17, but 99.19 percent, would you say that the probability of me being the father was greater than my brother?

A. Well, I would have to ask first of all did you both have sexual access to the woman in the case.

Q. I would have to answer in all fairness to you, yes, we both had access.

. . . .

A. If I remember your question, my answer was going to be that if both men being brothers had sexual access to the mother in the case, I would tell you I couldn't tell you which one is the father of that child.

Q. So that it not only requires of this 2.9 percent differential or 2.7 percent, I'm sorry, that they might have a higher probability of being the father, but it also requires that they must have had sexual access to the mother? Is that what you are saying?

A. Yes.

Q. What if I proved to you that Mark Kriner did not have sexual access to the mother? What would be the result of your—what would be your opinion on the test results that you gave us here today?

A. It wouldn't change.

. . . .

Q. Okay. How can that be if we are talking on the basis of my example with me and my brother when you say, "Well, I can't say, Mr. Quattrone, that you would be the father unless you tell me that both you and your brother had sexual access," but in this case of Mark Kriner when I say, "He didn't have sexual access," you say, "It doesn't make any difference, I still think he is the putative father"?

. . . .

A. Based on the testing results, I would have to say it's extremely likely if he had sexual access, that he is the father of that child.

Q. That's the second brother who tested higher?

A. No, Mr. Mark Kriner.

Q. All right now, let's go back to my example, okay? With brother one and brother two, now brother one has a test, he is 120 to 1 and 99.19. Brother two has the test, he comes out with a higher paternity index of 122 to 1 and 99.19. Based on your test results, why isn't brother two more probably the father than brother number one?

A. Well, first of all I am not at all surprised that two brothers have similar blood types. The basis of this test is genetic inheritance. We are looking at a family situation where we are looking at the blood types of the child; we are looking at the blood types of the mother. We gain a genetic description of the biological father of this child. Because the basis of this test is inheritance, I would expect in a family situation, for two brothers to share blood types. In fact, if you recall, most organ transplantations is [sic] done within a family situation. Often a brother is utilized or a sibling is utilized as a donor for another sibling. If you tell me two brothers or three brothers have similar or very much aligning or identical blood types, I am not surprised. The probability of paternity is based on calculation of this man's chance to the random population. A man, a sibling of a man involved in a paternity case is not the random population.

. . . .

Q. Let me ask you one more question. Of all these thousands of tests that you have done, have you found two people who were within the orbit of your 99 percent plausability of paternity for the same woman?

A. We have had cases where there were two men accused, and we were not able to exclude the other man.

Q. That both guys tested within the orbit of the possibility?

A.   I don't recall if they had the exact same plausibility of paternity, but they were not excluded and did have a plausibility of paternity.

■   We find that appellant's counsel was given plenty of leeway in his attempt to impeach the credibility of appellee's expert witness and discredit the results of the tests. In view of the fact that there was no testimony that appellant's brother Michael had engaged in intercourse with appellee, we find that the lower court did not err in prohibiting the introduction of Michael Kriner's blood test results.

■   Appellant argues further that the Uniform Act of Blood Tests to Determine Paternity, 42 Pa.C.S. § 6133 (hereinafter referred to as the Act), authorizes a court to order the testing of the blood of any person alleged by a party to be the father of the child in question, and that the results of such test should be admissible by either party to aid in the determination of parentage.  A panel of our court has determined that a court does not have the authority to order the testing of blood of persons who are not parties to the action. *In re Mengel*, 287 Pa.Super. 186, 429 A.2d 1162 (1981).  We therefore reject this argument.

■   Appellant next argues that the Act does not encompass the H.L.A. test, but only the red blood cell or exclusionary test, and that since the lower court's order of December 30, 1982 ordered appellant to submit to blood tests pursuant to the Act, the H.L.A. test results should not have been admitted into evidence absent stipulation of the parties.  Section 2 of the Act provides:

In any matter subject to this subchapter in which paternity, parentage or identity of a child is a relevant fact, the court upon its own initiative or upon suggestion made by or on behalf of any person whose blood is involved may, or upon motion of any party to the action made at a time so as not to delay the proceedings unduly, shall order the mother, child and alleged father to submit to blood tests. If any party refuses to submit to such tests, the court may resolve the question of paternity, parentage or iden-

tity of a child against such party, or enforce its order if the rights of others and the interests of justice so require. The Act provides the authority for court-ordered "blood tests", and does not limit the tests to red blood cell tests only. We find that Section 2 of the Act provides the authority for court-ordered H.L.A. blood tests as well as for red blood cell tests.[2]

■ Appellant argues that the lower court erred in allowing into evidence, over appellant's objection, a birth certificate which listed appellant as the father of appellee's child. We find no merit to this argument. Noting that the presence of the child in the courtroom didn't prove his birth date, the trial judge admitted the birth certificate into evidence, with a cautionary instruction to the jury. We find no prejudice to appellant from the introduction of this document, in light of the cautionary instruction. *Cf. Groulx v. Groulx*, 98 N.H. 481, 103 A.2d 188 (1954).

Appellant argues that a misstatement of evidence by appellee's counsel during closing argument so prejudiced appellant's case as to require a new trial. We disagree. Upon reviewing the testimony of one of appellant's witnesses, one Kelly Jolene Wilson (a friend of appellee), counsel stated that he had asked Ms. Wilson to name the person who had asked Mark Gagliardi to leave the courtroom, and that Ms. Wilson had replied that appellant's counsel had asked him to leave. After a sidebar discussion, appellee's counsel stated to the jury: "Ladies and gentlemen, you will note that prior to the objection by Mr. Quattrone [appellant's counsel] I had indicated that Mr. Gagliardi was asked to leave by Mr. Quattrone. I stand corrected. You have heard the record of this case. That's why we have a court reporter here, and she has indicated in response to my question to Kelly Jolene Wilson, Mr. Quattrone asked him

2. *Turek v. Hardy*, 312 Pa.Super. 158, 458 A.2d 562 (1983), did not decide the specific issue which is now before us. *Turek* held that, apart from the Act, H.L.A. blood tests are relevant and admissible evidence of the likelihood of paternity, provided that a proper foundation is laid. (Appellant in the case before us does not argue lack of a proper foundation).

to be here." In addition, the trial court pointed out: "For the record please, I want to make it clear that Mr. Roof [appellee's counsel] has acknowledged a misstatement. The record does not show that Mr. Quattrone asked Gagliardi to leave the courtroom. The record does show, for what it's worth, it's for you to judge, that witness Jolene or Kelly Jolene Wilson testified that Mr. Quattrone asked him to be present, asked Mr. Gagliardi to be present."

The resolution of whether or not remarks made by counsel in an argument to the jury warrant a new trial requires a determination based upon an assessment of the circumstances under which the statements were made and the precaution taken by the court and counsel to prevent such remarks from having a prejudicial effect. *Martin v. Philadelphia Suburban Transport Co.*, 435 Pa. 391, 257 A.2d 535 (1969). In the case before us, in light of counsel's acknowledgment of his error, and in light of the trial court's instruction to the jury, we find no prejudice to appellant.

Appellant argues that the lower court erred in charging the jury that they might infer from the defendant's failure to produce the testimony of Mark Gagliardi that Mr. Gagliardi's testimony would have been unfavorable to the defendant. The court's charge was as follows:

> In presenting his case, the defendant did not produce Mr. Gagliardi. The general rule is that where evidence, which would properly be part of a case, is within the control of or available to the party whose interest it would naturally be to produce it, and he failed to do so without satisfactory explanation, you may draw the inference that if produced, it would be unfavorable to him. You should apply that rule if you find a factual basis to do so.

In *Haas v. Kasnot*, 371 Pa. 580, 92 A.2d 171 (1952), the defendant in an automobile accident suit testified that a person not a party to the case had made a statement within a few minutes after the accident indicating his responsibility for the accident. The defendant did not produce the witness for trial, although the defendant knew the person's address. There was no indication that the person was

unavailable for trial. The trial court gave the missing witness instruction to the jury, but added, "the court is of the opinion that if [the witness] was a party in any way to the accident he was equally available to both plaintiffs and the defendant." In reversing the trial court's decision, the Supreme Court found that it was "naturally" in the defendant's interest to produce the third party as a witness, since the defense rested upon the contention that the third party was responsible for the accident; that such evidence was within the control of the defendant; that the defendant had offered no satisfactory explanation for the failure to produce the witness; and that the trial court's instruction should therefore have been given only with respect to the defendant.

In the case before us, during cross examination of the plaintiff, appellant's counsel asked the witness if she had ever dated Mark Gagliardi. Counsel for appellee objected to the question. At sidebar, the judge ruled that counsel was entitled to challenge the plaintiff's credibility, but that he regarded the line of questioning as being inflammatory unless counsel contradicted the plaintiff's answers with affirmative testimony. Counsel stated that he did have a witness to back up his inquiry, whom he intended to use. Proceeding to cross-examine the witness, counsel asked her if she knew Mark Gagliardi, if she had dated him, and if she had ever had sexual intercourse with him during the months of May through July, 1981. The witness responded that she knew Mr. Gagliardi, but had not dated him or had sexual intercourse with him. Although appellant's counsel subsequently called one Kelly Jolene Wilson, who testified that she knew plaintiff and Mr. Gagliardi had dated *prior* to May or June of 1981 and that she had seen them together on one occasion in June, 1981, walking down a road, kissing and holding hands, counsel did not elicit any testimony as to whether or not appellee had engaged in sexual intercourse with Mark Gagliardi. Although Mr. Gagliardi was present in the courtroom during at least part

of the trial, appellant's counsel did not call him to testify, and did not in any way attempt to rebut appellee's testimony on cross-examination that she had not engaged in sexual intercourse with Mark Gagliardi; furthermore, during closing argument, appellant's counsel strongly suggested to the jury that Mark Gagliardi was the father of the child.

Under the circumstances, we find: (1) that it was naturally in appellant's interest to produce Mark Gagliardi as a witness, since the defense was attempting to show that Mr. Gagliardi was the father of appellee's child; (2) that the witness was within the control of appellant, since appellant's counsel had been responsible for Mr. Gagliardi's presence in the courtroom,[3] had led the court and opposing counsel to believe that he would be presenting testimony of sexual intercourse between appellant and the witness (testimony which would be unlikely to come from anyone other than Mark Gagliardi), and since discovery was not available to appellee unless authorized by special order of court, Pa.R.C.P. No. 1910.9, the action having been commenced as a support action; (3) that appellant offered no satisfactory explanation for the failure to call the witness; and (4) that the lower court did not err in giving the missing witness charge to the jury. *Haas*, supra.[4]

■  Appellant next contends that the lower court erred in admitting into evidence testimony concerning a lab report which dealt with the H.L.A. test results performed on appellant. The testimony was elicited from Terry Houtz, supervisor of the laboratory which conducted the H.L.A. tests (the person responsible for all the activities in the H.L.A. laboratory), and from Margaret Ann Brooks, the general supervisor of the lab. Both witnesses were qualified as experts, and were accepted as such by the lower

---

**3.** The record indicates that Mark Gagliardi left the courtroom prior to the close of appellant's case.

**4.** But see, *Raffaele v. Andrews,* 197 Pa.Super. 368, 178 A.2d 847 (1962), and *Green v. Green,* 182 Pa.Super. 287, 126 A.2d 477 (1956).

court. These two persons had originally programmed the computer which was used to perform the calculations necessary for determining paternity indices, and had supervised the testing and prepared the report for this particular case.

Although the report bore the stamped "signature" of Robert E. Wenk, M.D., who did not appear to testify, since the report itself was not admitted into evidence, and since our examination of the notes of testimony of the trial convinces us that an adequate foundation was laid for the introduction of the test results by the two expert witnesses, we find that the lower court did not err in allowing the introduction into evidence of the results of the H.L.A. tests.

■ Appellant's final argument is that the lower court improperly taxed appellant with the costs of the H.L.A. tests, including the expert witness expenses. The Act provides:

> The compensation of each expert witness appointed by the court shall be fixed at a reasonable amount. It shall be paid as the court shall order. Subject to general rules, the court may order that it be paid by the parties in such proportions and at such times as it shall prescribe or that the proportion of any party be paid by the county and that after payment by the parties or the county, or both, all or none of it be taxed as costs in the action. Subject to general rules, the fee of an expert witness called by a party but not appointed by the court, shall be paid by the party calling him, but shall not be taxed as costs in the action.

It is clear that the lower court ordered appellant to submit to blood tests. We interpret this section of the Act as empowering a trial court to impose on appellant the costs of the tests and the compensation of any expert witnesses called to testify with respect to those tests.

Having found no merit to any of appellant's arguments, the order is accordingly affirmed.