Debra REED

v.

**John Harris BOOZER, Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 12, 1996.

Filed April 25, 1997.

William W. Boyd, Lancaster, for appellant.

Patricia L. Dunlevy, Lancaster, for appellee.

Before McEWEN, President Judge, and CAVANAUGH and TAMILIA, JJ.

TAMILIA, Judge:

John Harris Boozer appeals from the January 30, 1996 Order confirming a prior Order, issued on October 30, 1995, which directed appellant to pay $75 per week in child support. The facts of this case are as follows.

On November 27, 1991, appellee filed an action against appellant for support of her son, Anthony S. Boozer. Appellant denied paternity and by Order dated February 13, 1992, the court ordered blood testing of the parties and the minor child. The testing did not exclude appellant from paternity.[1] Rather, it indicated a 99.90% probability that appellant was the father of the child. A jury trial was conducted on November 30 and December 1, 1994. In support of the blood testing report, appellee presented the testimony of Ronald Barwick, Ph.D., Associate Director of the Department· of Paternity Evaluation at Roche Biomedical Laboratories, which conducted the testing. Appellant defended on the basis that his identical twin brother fathered the child. At the close of trial, the jury returned a verdict in favor of appellee, and the aforementioned child support Orders were entered.

On appeal, appellant asserts the following two claims:

I. Whether the trial court erred in permitting an expert witness to testify about laboratory results from tests which he did not perform, supervise or have personal knowledge about?

II. Whether the trial court erred in charging the jury that genetic test results are considered *prima facie* evidence of paternity, that the term "genetic tests" includes any blood or tissue testing process-

---

1. The blood testing consisted of red cell antigen, red cell enzymes, serum protein, ABO, Rh, MNS, Kell, Duffy and HLA tests.

es used to confirm or exclude parentage, and that the blood test results in this case should be considered *prima facie* evidence of paternity?

(Appellant's brief at 5.)

This is the first time this Court has been called upon to consider the enlarged definition of genetic tests, enacted by the Legislature in 1994, which states: " '**Genetic Tests**'. Includes any blood or tissue testing processes used to confirm or exclude parentage." [2] 23 Pa.C.S. § 4302.

■■■ As to appellant's first claim, we note that the admission of expert testimony is a matter for the trial court, and its decision will not be remanded, overruled or disturbed unless there was a clear abuse of discretion. *Tyus v. Resta,* 328 Pa.Super. 11, 476 A.2d 427 (1984). Preliminarily, our review of the record convinces us that Dr. Barwick provided an adequate foundation for the blood test results. At the outset, Dr. Barwick was qualified as an expert in blood testing, and was accepted as such by the court (N.T., 11/30/94, p. 6). Further, Dr. Barwick testified as follows:

> Q. [COUNSEL FOR APPELLEE]: What are some of your duties as an Associate Director [of the Department of Paternity Evaluation at Roche Biomedical Laboratories]?
>
> A. Well, it's my job as Associate Director to help provide overall supervision of the department; to help decide on the procedures and protocols that are used in the testing of blood samples for paternity evaluation; to evaluate the results of those tests and to sign the reports indicating the results of those tests and then, when the occasion calls for it, to testify about those results in court cases such as this one.

(N.T. at 4.) Dr. Barwick also testified that he was an official custodian of records for Roche Biomedical Laboratories (N.T. at 15), and that he had "reviewed this report as it pertains to the laboratory records and it does accurately reflect what we did in the laboratory" (N.T. at 48).

In *Mitchell v. Randall,* 368 Pa.Super. 421, 534 A.2d 508 (1987), appellant challenged the admission of trial testimony from a supervisor of the lab which conducted blood testing. In affirming the trial court, a panel of this Court held:

> Randall claims that the lower court erred in admitting the testimony of the medical expert because he did not actually perform the HLA blood test.
>
> . . .
>
> Our review of the record convinces us that an adequate foundation was laid for the introduction of the expert testimony. Appellant advances no case law or statute that would vitiate blood test results because the witness did not himself draw blood from the subjects or perform the tests but delegated these tasks to qualified technicians under his supervision. We find this issue to be without merit.

*Id.* at 427, 534 A.2d at 510. As his testimony indicates, Dr. Barwick not only supervised the lab, reviewed the test results in question and established the chain of custody, but he also was intimately familiar with, and helped to formulate, the procedures and protocols used to conduct the testing. In light of these facts, Dr. Barwick was properly permitted to testify concerning the test results and we reject appellant's claim to the contrary. *See Miller v. Kriner,* 341 Pa.Super. 293, 491 A.2d 270 (1985) (testimony of supervisor and general supervisor of testing lab constitutes adequate foundation for the introduction of blood test results, where those supervisors programmed the computers used to calculate the results); and *Commonwealth v. Khamphouseane,* 434 Pa.Super. 93, 642 A.2d 490 (1994) (proper foundation laid through testimony of laboratory director); *see also Rodgers v. Woodin,* 448 Pa.Super. 598, 672 A.2d 814 (1996) (although foundation not challenged on appeal, testimony concerning test results

---

**2.** As we pursue our analysis, it should be remembered that by beginning the definition with the word "Includes", it is clear the Legislature did not intend to nullify in any way the existing definition of genetic tests, but to expand it to tests not previously considered to be genetic tests.

provided by Associate Director of Paternity Determination at Roche Laboratories).[3]

Appellant also objects to the following charge to the jury by the court:

I will recall that Dr. Barwick testified that the genetic test results of the plaintiff and defendant and child demonstrate that it is extremely likely that the defendant, or one sharing his genetic characteristics, is the father of the child. Under the law, genetic test results are considered *prima facie* evidence of paternity. The phrase genetic tests includes any blood or tissue testing processes used to confirm or exclude parentage. Thus, the tests in this case should be considered *prima facie* evidence of paternity.

Therefore, if you determine that the defendant has not proved by any credible evidence to rebut the conclusion of the genetic test results, and if you disbelieve the testimony that someone else may have been the father who had exactly the same genetic characteristics, then it is extremely unlikely—I'm sorry, then you are required to find that he is the father. In other words, if you disbelieve the testimony that the child may be the child of his identical twin and you're convinced of the accuracy and the testimony of the expert, then the test results would establish a *prima facie* case that the defendant is the father. Unless you are presented with credible evidence to the contrary, you must adopt the genetic test results and find the defendant is the child's father.

(N.T., 12/1/94, p. 66–67.)

▇ Appellant argues this instruction was error for the following reasons:

This requested instruction followed the statutory provision found at 23 Pa.C.S.A. § 4343(c) concerning genetic tests. The

language in effect at that time read that 'genetic test results shall be considered prima facie evidence of paternity'. [T]he court erred in instructing the jury as it did because section 4343 is not applicable to this case. The tests actually performed were standard blood grouping, blood typing, and HLA testing, none of which falls within any accepted definition of 'genetic tests'.

(Appellant's brief at 15.) Thus, appellant's argument is that the jury should not have been instructed to consider the tests at issue *prima facie* evidence of paternity, because those tests were merely blood tests and did not "fall[ ] within any accepted definition of 'genetic tests' ". We believe, insofar as genetic tests have been defined in previous cases, appellant is correct, but those cases are in apparent conflict with a recently enacted statutory definition of "genetic tests", which has expanded the definition of "genetic testing" far beyond the commonly accepted medical and scientific definition of that term. Further, the new definition, unless we can rationalize it with medical and scientific terminology and procedures, will impose a degree of certainty to tests such as blood groupings and HLA which have never been accorded such certainty in the past. To accord the legislation its full effect, as we must, requires a reevaluation of concepts which, in the past, have been accorded different weight as evidence.

In probably the only area of family law where proof and certainty takes on some of the attributes of criminal cases, paternity cases are unique.[4] It is difficult to believe that the legislature which imposed such a high standard in this category of cases intended to group proof of paternity, which has a serious element of uncertainty about it

---

3. We also note that by amendment effective December 16, 1994, a mere fifteen days after appellant's trial, the Legislature added the following provision to 23 Pa.C.S. § 4343(c)(3):

§ 4343. Paternity

. . .

(c) Genetic tests.—

. . .

(3) . . . The certified records [of a genetic testing laboratory] shall be admissible into evidence *without further foundation*, authen-

tication or proof of accuracy if no objection is made within ten days prior to trial.
(Emphasis added.)

4. "The nature of paternity proceedings ... also bears heavily on appellant's due process claim. Although the state characterizes such proceedings as "civil," they have "quasi-criminal" overtones." *Little v. Streater*, 452 U.S. 1, 10, 101 S.Ct. 2202, 2207, 68 L.Ed.2d 627, 635 (1981) (citations omitted).

(blood grouping or tissue matchings), in the same category as DNA (genetic testing), which is virtually unassailable if correctly performed, which establishes a *prima facie* case of paternity. The only means of reconciling these differences is to accord to the legislative language a much broader definition of genetic testing than has been the case in the past.

As previously indicated, the statutory provision, 23 Pa.C.S. § 4302, provides as follows: " 'Genetic tests'. Includes any blood or tissue testing processes used to confirm or exclude parentage." Accordingly, the statutory definition of "genetic testing" expressly includes "*any blood or tissue testing* processes used to confirm or exclude parentage." Under this provision, genetic testing is no longer limited to DNA testing as has frequently been described and explained in cases interpreting "genetic testing". For example, *see Stahli v. Wittman,* 412 Pa.Super. 281, 287, 603 A.2d 583, 586 (1992), in which the court noted, "[g]enetic tests differ significantly from the blood cell antigen typing [HLA test] performed in the instant case." At trial, Dr. Barwick testified as follows:

Q. [COUNSEL FOR APPELLEE]: And what are the names of those tests that you do?

A. Well, we—at the time this test was done we do five systems of blood cell antigen. That would be the ABO tests like blood tests, the Rh factor test, the test called the MNS test, the test called the Kell test and the test called the Duffy test. All of those are inherited factors that are present on the surface of red blood cells.

Another test that we do routinely in cases like this is the HLA test or human leukocyte antigen test. That is the so-called tissue typing antigens or factors that are present on the surface of the white blood cells. And those, you know, that is another test that we do for paternity and then, in addition to that, we can run up to three, three or four systems of red cell enzymes and serum proteins and those are simply proteins for other inherited factors that are present in the liquid portion of the blood or else inside the red cells themselves.

(N.T. at 9–10.)

. . .

Q. And which tests were performed?

A. In this particular case we did the five systems of red cell antigens that I mentioned before, the ABO test, the Rh test, the MNS test, the Kell test and the Duffy test. We also ran the leukocyte antigen [HLA] test and three systems of red cell enzymes and serum proteins.

(N.T. at 18.)

. . .

Q. Can Mr. John Boozer be excluded from paternity?

A. No, he cannot.

(N.T. at 22.)

. . .

Q. What is the probability of paternity in this case?

A. The probability of paternity that corresponds to [the] combined paternity index is 99.90%.

(N.T. at 26.)

As this testimony indicates, the procedures in question used both blood and tissue testing processes to confirm parentage. Thus, according to section 4302, the instant tests were "genetic tests" and the court's charge to this effect was proper. In arguing his claim that the procedures used here were not "genetic testing", appellant relies on *Stahli, supra,* but because *Stahli* predates the July 2, 1993 effective date of section 4302's definition of "genetic testing", we cannot ignore the statutory enlargement of the definition of genetic tests despite the distinction between genetic testing and HLA testing asserted in *Stahli.* This becomes even more relevant when we note that, in addition to the amendment referred to in footnote 2, the Legislature also amended section 4343(c)(2), effective December 16, 1994, to increase the strength of the inference to be drawn from genetic tests indicating paternity. The section now provides:

## § 4343. Paternity

. . .

### (c) Genetic tests.—

. . .

(2) Genetic test results indicating a 99% or greater probability that the alleged father is the father of the child shall *create a presumption of paternity* which may be rebutted only by clear and convincing evidence that the results of the genetic tests are not reliable in that particular case.

*Id.* (emphasis added).

In light of this provision, the court's charge that "genetic test results are considered *prima facie* evidence of paternity" also was correct. In fact, the charge was virtually a verbatim recitation of the prior version of 23 Pa.C.S. § 4343(c)(2), which provided:

### § 4343. Paternity

. . .

### (c) Genetic tests.—

(2) Genetic test results shall be considered prima facie evidence of paternity.[ ]

Far from directing a verdict in favor of appellee, as appellant claims, the court's charge merely provided the jury with an accurate statement of law.

The remainder of the charge also placed the mandate of section 4343(c)(2) in its proper perspective. In addition to informing the jury that it was free to assess the credibility of all the witnesses and evidence, the court also instructed that "credible evidence to the contrary" could rebut the inference of *prima facie* proof arising under section 4343(c)(2). See N.T., 12/1/94, p. 67 ("If . . . you're convinced of the accuracy and the testimony of the expert, then the test results would establish a *prima facie* case that the defendant is the father. *Unless you are presented with credible evidence to the contrary,* you must adopt the genetic test results and find the defendant is the child's father.") (emphasis added). Finally, on two occasions the court recalled Dr. Barwick's testimony and in-

structed the jury that "[y]ou are not bound by an expert's opinion merely because he is an expert; you may accept or reject it as in the case of other witnesses, give it the weight, if any, to which you deem it to be entitled." (N.T. at 59, 65–66.)

In this case, we are called upon to apply the law as enacted by the Legislature in a piecemeal fashion over a period of more than 35 years. This requires us to look to its evolution since Pennsylvania adopted the Uniform Act on Blood Tests to Determine Paternity in 1961 (July 13, P.L. 587), 23 Pa.C.S. § 5104 *et seq.* That act, which still is viable, stated "If the court finds that the conclusions of all the experts as disclosed by the evidence based upon the tests are that the alleged father is not the father of the child, the question of paternity, parentage or identity of a child shall be resolved accordingly." *Id.,* § 5104(f). The level of science at that point permitted paternity to be *excluded* to a degree of medical/scientific certainty when the blood type of the child could not be matched to that of the alleged father. Testing at that level of scientific certainty could not meet the level of evidence required to *establish* paternity but only permitted *exclusions* with certainty. Until the development of DNA genetic testing, the genetic relationship between the child and his alleged father was circumstantial evidence as opposed to direct evidence of the paternal relationship. Testing at the time of adoption of the Uniform Act was relegated to establishing the basic blood types, ABO and R.H. factors, M.N.S., and whether the child's blood had genetic markers which did or did not match those of the father. If the blood group and markers existed, the alleged father could not be excluded; if they did not exist in the child's blood, the alleged father had to be excluded.

Subsequently, with the advent of transplant surgery and the necessity of obtaining close matches between the tissue of donors and donees, more sophisticated blood and tissue testing evolved to assure the highest degree of compatibility to reduce the risk of organ rejection. From this experimentation and refinement of blood and tissue groupings evolved expanded typing, ABO (blood type),

MNS (R.H. factor), Kell and Duffy tests and HLA, human leukocyte antigen test (tissue typing). The blood typings are found on the *surface* of the red blood cells, the HLA factors are found on the surface of the white blood cells. Three or four other factors found in the liquid portion of the red blood cell also are inherited factors. All of these factors provide for exclusion of a person who is not the parent of the child, but more than that, for the first time they provide a statistical basis for determining the "possibility" of paternity. Depending upon how many factors are incorporated into the tests, they still provide only circumstantial evidence and not direct evidence of paternity, but it is possible to establish a "paternity index" using a formula known as the "Esser–Moller" version of the Bayes' Theorem. See Case Comment "Human Leukocyte Antigen Test Results Are Admissible in Paternity Cases to Show the Likelihood of Paternity", 88 Dick.L.Rev. 565 (1984). These became known as "genetic markers"[5] as they are inherited factors although they differ from true genetic material found in DNA, which is the genetic compounds passed directly from parent to child.[6]

■ For the first time in 1983, by the introduction of HLA testing, blood test evidence became admissible to establish the possibility of paternity. It was and is not conclusive or irrebuttable presumptive evidence of paternity and must be considered in conjunction with all other evidence. Although at that time there was no legislation treating such evidence as admissible for proof of paternity in *Turek v. Hardy*, 312 Pa.Super. 158, 458 A.2d 562 (1983), this Court, upon reviewing extensive studies, documentation and holdings in other jurisdictions, held that such evidence was admissible upon stipulation by counsel. *Turek* also established guidelines for the admission of such testing. Despite the paternity index in a given case providing a high degree of probability of paternity produced by the calcula-

tions, there are other men in the population whose test results would be identical. *See Olson v. Dietz*, 347 Pa.Super. 1, 500 A.2d 125 (1985).

■ Admissibility of HLA results as evidence of paternity were to be considered as a fact question resolved by the trier of fact. A preliminary evidentiary threshold was submission of evidence of intercourse at or about the time of conception before evidence of the blood test was relevant. *Stahli, supra.* In that case, this Court rejected a finding of 99.99% probability of paternity where the mother was not credible about having sexual relations with the putative father at the relevant time of conception. At no time in our appellate consideration of HLA testing was it construed to be a genetic test, but only circumstantial evidence of inherited characteristics. Even with probabilities over 99%, the "random man" variable that other men of similar racial-ethnic background have similar characteristics is considerable. The status of HLA testing vis a vis its evidentiary weight as to paternity has not changed from *Turek* until now. What has changed is the promulgation of legislation, which has introduced a new evidentiary standard to be applied and recognition of advances in genetic testing as supportive of that standard. It is crucial to note that any finding of less than 99% probability is entitled to no presumptive weight, indicating the lack of absolute certainty in this process.

In 1989, without reference to HLA testing or the Uniform Blood Test Act, the Legislature inserted subsection (c) in 23 Pa.C.S. § 4343, permitting genetic tests to be conducted upon the request of any party to an action to establish paternity. In subsection (c)(2), it also provided that the results of genetic tests would be considered *prima facie* evidence of paternity. This addition did not provide for HLA or blood grouping testing to be incorporated in genetic testing and therefore established three levels of proof in

---

**5.** Genetic marker n: a usu. dominant gene or trait serves esp. to identify genes or traits linked with it—called also marker. *Webster's Medical Desk Dictionary* (1986).

**6.** The average DNA test utilizes two to four probes, each having the power of exclusion of a

single Human Leukocyte Antigen (HLA) test. The use of multiple probes can result in a probability of paternity of 99.99% with genetic odds in favor of over one in 10,000. Byne, "Using DNA Evidence to Prove Paternity: What the Attorney Needs to Know," 19 FLR 3001 (1992).

blood testing or tissue testing. The first is the standard blood tests, which are admissible to exclude the possibility of paternity; the second is HLA, which, if paternity is not excluded, pursuant to statistical formula can establish a "parental index" as evidence of the probability of paternity; the third is genetic testing, which by accepted medical and scientific standards is the *only* direct (as opposed to circumstantial) evidence of a genetic link between the child and the putative father and may be *prima facie* evidence of paternity. By reaching inside of the blood cell, tissue or serum segment of the blood of the child, nucleic acids, which are the molecular basis of heredity, can specifically be identified as the genetic material contained in the chromosome of the parent and transmitted to the child from the parent during the process of conception. The result is that with a 99% probability under HLA combined with standard blood groupings, the possibility of random persons other than the putative father being the parent may be numerous. When genetic testing, which involves genes identified in the chromosome hylex matching those of a putative father and child, is utilized, a 99% likelihood will mean that only one in one hundred thousand, millions or billions could be the father. The only absolute match of two adults through DNA testing would be identical twins. The difference in process of HLA or blood tests, mathematic formulations and materials identified makes coupling under the heading of genetic testing broadly meaningful but inaccurate.[7] The original interpretation of genetic testing following this term's introduction into section 4343(c) in 1989, clearly and unequivocally required that we distinguish between HLA and genetic tests.

Genetic tests differ significantly from the blood cell antigen typing performed in the instant case. Genetic testing provides direct evidence of the extent to which an alleged father and child actually share genetic material. See: American Medical Association, Medical Dictionary, pp. 774–775 (Random House, 1989). From the results of genetic tests, adequately and accurately performed, it is possible to determine that a particular man did in fact father a particular child.

*Stahli, supra* at 287, 603 A.2d at 586.

■ To rationalize this evolving process relating to the application of blood tests to determining paternity, it is necessary to construe the statutory and case law in a manner which permits application of both. From *Stahli*, we must accept the higher validity and evidentiary value of DNA testing as a genetic test, and as such, it may be conclusive of paternity. As to HLA and the other blood grouping and typing tests based on genetic markers, these will be considered evidence of paternity which creates a presumption of paternity when the paternity index reaches a level of 99% and is not rebutted by the defendant.

■ The facts of this case clearly present a matter for determination by a jury and which would not permit the court to direct a verdict for appellee/plaintiff. In this case, the paternity index attained by mathematical formulation based on HLA factors was 99.9%. Evidence was submitted that the appellant/defendant did not have intercourse with appellee during the period of conception, that his identical twin (established by DNA testing) did have intercourse with appellee/plaintiff, and that additional witness on behalf of appellee/plaintiff indicated appellant/defendant was dating her during the period of conception.

■ The trial court properly charged the jury that it was not required to accept the testimony of the expert and that it could make its determination on all of the facts

---

7. In a Georgia case, *Sidwell v. Sidwell*, Ga.Super.Ct. Morgan Cty, No. 91CA–173 (1992), cited at 19 F.L.R. 3003 (1992), husband and wife were in an on and off relationship during which time a third child was born. The mother alleged the father of the child was a third party and not the husband. Utilizing both blood grouping tests and HLA, the lab obtained a paternity index as to the legal father of 99.54% probability. However, utilizing two DNA probes on the third party, a different laboratory established him to be the father by the paternity index of 99.99% probability. Further testing on all parties showed the legal father's apparent match was a remarkable coincidence and the man who's DNA initially matched the child's DNA was indeed the biological father.

presented. The facts could sustain a finding that appellant had intercourse with appellee/plaintiff at or about the time of conception, that he could not be excluded as the father, that he or his identical twin had the same genetic make up, that he or his identical twin brother could have fathered the child based on the paternity index established by HLA testing and, therefore, the *prima facie* evidence of paternity alone, based upon the "genetic testing", was insufficient to establish paternity as it applied equally to both. These facts presented a jury question and although the definition of genetic testing introduced by statute has been expanded to include a looser concept of genetic identification that encompasses genetic markers derived from blood grouping and HLA testing, than the genetic testing based on DNA analysis, as established by case law, the intrinsic evidentiary process remains the same. First, access and intercourse must be established as the threshold to make out a cause of action for paternity. Second, blood tests, when ordered, must be conducted in certified laboratories with verifiable and optimum scientific controls. Third, the procurement of blood samples must be done under secure circumstances to protect the integrity and identity of the donors and the unbroken chain of evidence. Fourth, if the test excludes the defendant as the father, the case ends on that evidence. Fifth, when the blood test reports establish a 99% or better probability of paternity by the mathematically determined paternity index, based on genetic markers identified in blood groupings, serum or tissue, *prima facie* evidence of paternity has been established. Such a finding may be rebutted by a showing by clear and convincing evidence that the results of the testing are not reliable in that case.

■ As here, such a showing may be established by proving non-access, or that an identical twin could have had access. It also may be established that the controls failed in testing, the chain of custody was breached, the blood sample was contaminated, the mechanical or laboratory processes were flawed, the computations or computer analyses were incorrect or in any other way the process was compromised.

In this case, which was well tried, there appeared to be a vigorous defense which presented to the jury very substantial questions of reliability of the results of the test (as opposed to their performance). The jury was well instructed in the law and how it should be applied to the facts of this case by an informed and careful trial judge. There was sufficient evidence upon which the jury could find, applying the standard of clear and convincing evidence, that appellant was not the father of the child. There was more than adequate evidence that the jury could find, by the preponderance of the evidence, that he was the father of the child. There was no evidence that the appellant could be excluded as the father of the child.

■ We perceive no error in the charge by the trial judge; the issue resolved by the jury was purely one of credibility and weight of the evidence and there is no question that its finding of paternity was supported by that evidence. We find that the 1993 statutory definition of genetic testing expanded but did not exclude the previous definition of genetic testing established by case law to include genetic markers derived from blood grouping and HLA testing. Since this Court has determined that HLA testing and genetic testing meaning DNA testing are not interchangeable and DNA testing is not duplicative or cumulative of HLA testing, the weight given to each can be different. *Mastromatteo v. Harkins*, 615 A.2d 390, 419 Pa.Super. 329 (1992). It follows, therefore, that where HLA testing and DNA testing produce different results the weight given to DNA testing must be greater than that given to HLA testing. It must be left to a more appropriate case to determine if DNA testing provides an irrebuttable presumption of paternity as opposed to a *prima facie* finding of paternity based upon the current definition of genetic evidence and the results flowing from a finding of probability of 99% or more, pursuant to 23 Pa.C.S. § 4343(c)(2).

Based on the foregoing, we affirm the Order of January 30, 1996.

Order affirmed.