701 A.2d 176

**Lisa A. BRINKLEY, Appellant,**

**v.**

**Richard E. KING, Appellee.**

Supreme Court of Pennsylvania.

Argued Sept. 19, 1996.

Decided Sept. 17, 1997.

Robert D. Clark, Wilmington, for Lisa A. Brinkley.

Phillip L. Clark, Jr., Ellwood City, for Richard E. King.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

## OPINION ANNOUNCING THE JUDGMENT
## OF THE COURT

FLAHERTY, Chief Justice.

One of the strongest presumptions in Pennsylvania law is that a child conceived or born in a marriage is a child of the marriage. In order to rebut the presumption it must be proved by clear and convincing evidence that at the time of conception, the husband either was not physically capable of procreation or had no access to the wife. The issue in this case is whether the presumption applies to the facts of this case.

Lisa Brinkley was married to and was living with George Brinkley in February 1991, when Lisa's daughter, Audrianna, was conceived. George moved out in July, 1991, four months before the child was born. Lisa stated that at the time Audrianna was conceived the former husband slept on the couch and she slept in a bedroom. Further, although her former husband was not physically incapable of procreation at the time Audrianna was conceived and although he was free to enter her bedroom, she and her husband did not have sexual relations. Lisa also testified that she was having sexual relations with Richard King during the period when Audrianna was conceived [1] and that her husband filed for divorce because he learned that she was pregnant by King.

Lisa testified that King came to the hospital when Audrianna was born and he visited the child on a weekly basis thereafter for approximately two years until Lisa filed a complaint for support. Although King and his wife also paid Lisa a monthly stipend for Audrianna's support, Lisa filed a

---

**1.** Although the trial court stated: "Conspicuous by its absence from the testimony is any indication that Mr. and Mrs. Brinkley had stopped having sexual relations at or about the time that Audrianna was conceived," the trial court was mistaken:

> Q. In February, in January, February and March of 1991 were you having sexual relations with your husband George Brinkley?
> A. No, I was not.
> Q. Were you having a sexual relationship with anyone at that time?
> A. Richard King.

N.T. at 15.

complaint for support because the amount was insufficient. Finally, Lisa testified that King placed Audrianna on his medical insurance.

Concerning her former husband, Lisa testified that after they were separated, the former husband came to visit her other child, whom the former husband acknowledged as his own, but he did not visit Audrianna.[2]

On October 29, 1993, Lisa filed a complaint for support against Richard King, alleging that Audrianna was the child of King. King denied paternity and refused blood testing. Lisa then filed a motion for adjudication of paternity and King answered that Lisa was precluded from claiming that he was the father of Audrianna because she had failed to rebut the presumption that her former husband was the father. The trial court treated the motion for adjudication of paternity as a motion for blood tests and directed the parties to submit memoranda of law on their positions. The court thereafter concluded that Lisa had failed to rebut the presumption that her former husband was Audrianna's father, for she was unable to establish that the former husband had no access during the period of conception, and denied the motion for blood tests. Lisa then appealed to Superior Court.

Superior Court affirmed, holding that Lisa had not presented clear and convincing evidence that her former husband had no access to her during the period of conception. Nonetheless, two of three judges on the Superior Court panel, in a memorandum opinion, expressed reservations that considerations of impotence or lack of access should be the exclusive considerations sufficient to rebut the presumption of paternity. They suggested that this court consider whether additional factors, such as the identity of the father named on the child's birth certificate, whether the putative father has established a

---

2. In describing her former husband's visits, Lisa stated:

Q. When he comes to see the children, he spends time with both of them, correct?

A. The first two years, he did not spend any time with her whatsoever. It is just sympathy against—he just takes her every now and then because she wants to go with him, but she knows who her dad is.

N.T. at 26.

relationship with the child, whether the putative father provided support for the child, and whether the putative father provided medical insurance for the child should be also considered in rebuttal of the presumption.

We granted allocatur in order to review the way in which the presumption of paternity functions in Pennsylvania law.[3]

In *John M. v. Paula T.*, 524 Pa. 306, 571 A.2d 1380 (1990), a third party sued to establish his own paternity as against that of the presumptive father. The child was conceived before the mother married, but was born while the mother was married to and living with her husband. Husband and wife cared for the child and remained together at the time the lawsuit was filed. The third party sought to compel the presumptive father to submit to blood tests. Former Chief Justice Nix, concurring in *John M.*, wrote:

[I]t should remain clear that a child born to a married couple will be presumed to be the issue of the husband. That presumption can be overcome only by proof of facts establishing non-access or impotency. *Cairgle v. American Radiator and Standard Sanitary Corp.*, 366 Pa. 249, 77 A.2d 439 (1951). It continues to be one of the strongest presumptions within our law. *Commonwealth ex rel. Leider v. Leider*, 434 Pa. 293, 254 A.2d 306 (1969); *Cairgle, supra; Commonwealth, ex rel. O'Brien v. O'Brien*, 390 Pa. 551, 136 A.2d 451 (1958 [1957]).

* * *

[The Uniform Act on Blood Tests to Determine Paternity] cannot be used by a third party, seeking to rebut the presumption, to compel a *presumed* father to submit to a blood test. Whatever interests the putative father may claim, they pale in comparison to the overriding interests of the presumed father, the marital institution and the interests of this Commonwealth in the family unit. These inter-

---

3. Because of our disposition of the case, we do not address Lisa's additional claim that it was error for the trial court to fail to consider an order entered in a separate proceeding which excluded Lisa's former husband as the father of Audrianna.

ests are the cornerstone of the age-old presumption and remain protected by the Commonwealth today.

> Thus a third party who stands outside the marital relationship should not be allowed, for any purpose, to challenge the husband's claim of parentage. I believe the presumption in this situation is irrebuttable....

524 Pa. at 322–23, 571 A.2d at 1388–89 (concurring opinion joined by four other members of the court).

In *John M.* a third party was attempting to defeat the paternity of the presumed father, but three years later, in *Jones v. Trojak*, 535 Pa. 95, 634 A.2d 201 (1993), we addressed a different fact situation. In *Trojak* the mother sued the third party for child support, claiming that he, rather than her husband, was the father. The child was born while she was married to and living with her husband. Trojak denied paternity and objected to the trial court's order for blood tests on the grounds that the mother had not rebutted the presumption that the child was the child of the marriage. We stated:

> A court may order blood tests to determine paternity only when the presumption of paternity has been overcome. *John M. v. Paula T.*, 524 Pa. 306, 571 A.2d 1380, *cert. denied*, 498 U.S. 850, 111 S.Ct. 140, 112 L.Ed.2d 107 (1990). This Court has held that the presumption can be overcome by proof of facts establishing non-access or impotency. *Cairgle v. American Radiator and Standard Sanitary Corp.*, 366 Pa. 249, 77 A.2d 439 (1951). However, under certain circumstances, a person might be estopped from challenging paternity where that person has by his or her conduct accepted a given person as the father of the child.

535 Pa. at 105, 634 A.2d at 206. In *Trojak* the mother established that she and her husband did not live together as an intact family; her husband had not accepted the child; the husband and wife had repudiated their marriage vows long ago; the husband never supported the child; and when the child was conceived, the husband was physically incapable of procreation.

 These cases set forth the fundamentals of the law of presumptive paternity: generally, a child conceived or born during the marriage is presumed to be the child of the marriage; this presumption is one of the strongest presumptions of the law of Pennsylvania; and the presumption may be overcome by clear and convincing evidence either that the presumptive father had no access[4] to the mother or the presumptive father was physically incapable of procreation at the time of conception. However, the presumption is irrebuttable when a third party seeks to assert his own paternity as against the husband in an intact marriage. *John M.*, 524 Pa. at 323, 571 A.2d at 1388-89.

The legal identification of a father, however, even in a case involving the presumption of paternity, may also involve the question of estoppel. One or both of the parties may be prevented from making a claim based on biological paternity because they have held themselves out or acquiesced in the holding out of a particular person as the father.[5] In *Trojak* this court stated that:

> under certain circumstances, a person might be estopped from challenging paternity where that person has by his or her conduct accepted a given person as the father of the

**4.** "No access" means simply that it was physically impossible for the presumptive father and the mother to have had sexual relations. For example, the parties lived in locations that are distant from each other and had no physical contact. Of course, it is possible that people living in New York and Australia may meet and have sexual contact, and it is for the trial court to decide whether sexual contact was physically possible in a given case.

**5.** In *Freedman v. McCandless* we defined estoppel as follows:

Estoppel in paternity actions is merely the legal determination that because of a person's conduct (e.g., holding out the child as his own, or supporting the child) that person, regardless of his true biological status, will not be permitted to deny parentage, nor will the child's mother who has participated in this conduct be permitted to sue a third party for support, claiming that the third party is the true father. As Superior Court has observed, the doctrine of estoppel in paternity actions is aimed at "achieving fairness as between the parents by holding them, *both* mother and father, to their prior conduct regarding the paternity of the child."

539 Pa. 584, 591-92, 654 A.2d 529, 532-33 (1995)(emphasis in original).

child. . . . [T]he doctrine of estoppel will not apply when evidence establishes that the father failed to accept the child as his own by holding it out and/or supporting the child. . . . Only when the doctrine of estoppel does not apply will the mother be permitted to proceed with a paternity claim against a putative father with the aid of a blood test. *Trojak*, 535 Pa. at 105–06, 634 A.2d at 206.[6]

The presumption of paternity and the doctrine of estoppel, therefore, embody the two great fictions of the law of paternity: the presumption of paternity embodies the fiction that regardless of biology, the married people to whom the child was born are the parents; and the doctrine of estoppel embodies the fiction that, regardless of biology, in the absence of a marriage, the person who has cared for the child is the parent.

▮ The public policy in support of the presumption of paternity is the concern that marriages which function as family units should not be destroyed by disputes over the parentage of children conceived or born during the marriage. Third parties should not be allowed to attack the integrity of a functioning marital unit, and members of that unit should not be allowed to deny their identities as parents.[7] Estoppel is based on the public policy that children should be secure in knowing who their parents are. If a certain person has acted as the parent and bonded with the child, the child should not

6. Accord, *John M. v. Paula T.*:

> [I]t is recognized that, under certain circumstances, a person might be estopped from challenging paternity where that person has by his or her conduct accepted a given person as father of the child. . . . [W]here the principle [of estoppel] is operative, blood tests may well be irrelevant, for the law will not permit a person in these situations to challenge the status which he or she has previously accepted.

> 524 Pa. at 318, 571 A.2d at 1388, cited in *Freedman v. McCandless*, 539 Pa. at 591–92 n. 5, 654 A.2d at 533 n. 5 (1995).

7. The presumption of paternity "is essential in any society in which the family is the fundamental unit." *O'Brien v. O'Brien*, 390 Pa. 551, 555–56, 136 A.2d 451 (1957). In *John M. v. Paula T.*, 524 Pa. at 322–23, 571 A.2d at 1380, the court stated that the "interests of the presumed father, the marital institution and the interests of this Commonwealth in the family unit," are paramount.

be required to suffer the potentially damaging trauma that may come from being told that the father he has known all his life is not in fact his father.

■ Thus, the essential legal analysis in these cases is twofold: first, one considers whether the presumption of paternity applies to a particular case. If it does, one then considers whether the presumption has been rebutted. Second, if the presumption has been rebutted or is inapplicable, one then questions whether estoppel applies. Estoppel may bar either a plaintiff from making the claim or a defendant from denying paternity. If the presumption has been rebutted or does not apply, and if the facts of the case include estoppel evidence, such evidence must be considered. If the trier of fact finds that one or both of the parties are estopped, no blood tests will be ordered.

■ It remains to consider how one knows whether the presumption applies in any given case. Traditionally, the answer to this question has been that the presumption applies if the child was conceived or born during the marriage. We now question the wisdom of this application of the presumption because the nature of male-female relationships appears to have changed dramatically since the presumption was created. There was a time when divorce was relatively uncommon and marriages tended to remain intact. Applying the presumption whenever the child was conceived or born during the marriage, therefore, tended to promote the policy behind the presumption: the preservation of marriages. Today, however, separation, divorce, and children born during marriage to third party fathers is relatively common, and it is considerably less apparent that application of the presumption to all cases in which the child was conceived or born during the marriage is fair. Accordingly, consistent with the ever-present guiding principle of our law, *cessante ratione legis cessat et ipsa lex,* we hold that the presumption of paternity applies in any case where the policies which underlie the presumption, stated

above, would be advanced by its application, and in other cases, it does not apply.[8]

■ In the case at bar, at the time of the complaint for support, there was no marriage. Lisa and George Brinkley had separated before the birth of the child and were divorced at the time of the complaint. The presumption of paternity, therefore, has no application to this case, for the purpose of the presumption, to protect the institution of marriage, cannot be fulfilled. It was error, therefore, to fail to consider the estoppel evidence, for estoppel evidence may be presented where the presumption does not apply.

The order of Superior Court is vacated and the case is remanded to the trial court for a hearing on the issue of

8. In holding that the presumption applies only where the policy upon which it is based would be advanced, we are suggesting a simplified way of regarding presumption cases. In *Cairgle v. American R. and S.S. Corp.*, 366 Pa. 249, 77 A.2d 439 (1951), for example, the husband and wife were separated in 1932, but were never divorced. The wife moved in with another man in 1945 and the husband lived with another woman beginning in 1942, and both parties lived with these persons continuously until 1948, when Cairgle died. The wife gave birth to three minor children, one in 1939, one in 1942 and one in 1943. The children were given the name Owens; they lived with Owens and never with Cairgle; and Owens, not Cairgle, supported them. After the husband, Cairgle, died of silicosis in 1948, the wife sought to collect benefits under the Workmen's Compensation Act for her children. In order to be entitled to these benefits, she was required to prove that her children were "legitimate." 366 Pa. at 254–55, 77 A.2d at 442. The *Cairgle* court agreed that the presumption of paternity applied even to these facts:

If, as claimant testified, she had sexual intercourse with her husband during her pregnancy for her minor children when she was living in adultery with another man, the children would be considered, in law, the children of her husband and the presumption of legitimacy would be irrefutable.

*Id.* at 257, 77 A.2d at 443, citing *Dennison v. Page*, 29 Pa. 420 (1857). The court upheld the denial of benefits because it did not believe the wife's claim that she continued to have sexual intercourse with Cairgle after she was separated or that Cairgle sent support payments. In other words, the wife's lack of credibility and her life with Owens rebutted the presumption. Our view, as expressed today, would be that when the parties separated, the presumption of paternity was inapplicable, and the mother would be estopped from claiming that Cairgle was the children's father based on her life with Owens.

estoppel.[9]

ZAPPALA, J., files a concurring opinion.

NIGRO, J., files a concurring and dissenting opinion.

NEWMAN, J., files a concurring and dissenting opinion in which CASTILLE, J., joins.

ZAPPALA, Justice, concurring.

In *John M. v. Paula T.*, 524 Pa. 306, 571 A.2d 1380 (1990), we held that a child born to a married couple will be presumed to be the issue of the husband unless there is proof of facts establishing non-access or impotency. Non-access is defined by the majority in this case to mean "that it was physically impossible for the presumptive father and mother to have had sexual relations." I find the majority's definition of non-access unnecessarily restrictive for the reasons articulated by Madame Justice Newman in footnote eight of her concurring and dissenting opinion. The testimony of Lisa Brinkley that she and her former husband did not have sexual relations during the period of conception was sufficient to establish non-access and to overcome the presumption. As this analysis is consistent with our holding in *John M. v. Paula T.*, I do not believe it is necessary to re-examine the policy considerations that underlie our decision in that case. I would reverse the order of the Superior Court and remand the matter to the common pleas court for further proceedings.

NIGRO, Justice, concurring and dissenting.

I agree with the Majority that this case should be remanded, but, for the reasons presented below, I am unable to completely join in the Majority's decision.

9. We decline to accept Superior Court's suggestion that we expand the ways in which one can rebut the presumption of paternity. Superior Court's proposed additional factors to rebut the presumption, such as whether the putative father established a relationship with the child, are appropriate in an estoppel context, but not in a presumption of paternity context. The presumption of paternity continues to be rebutted, if at all, by evidence related to biology: there was no access or the presumptive father was incapable of procreation.

The Majority recognizes that "separation, divorce, and children born during marriage to third party fathers is [now] relatively common, and it is considerably less apparent that application of the presumption [of paternity] to all cases in which the child was conceived or born during the marriage is fair." Op. at 181. I agree with this assertion.

However, despite the Majority's recognition of this disparity between practical reality and legal rule, they have chosen nonetheless to preserve the "two great fictions of the law of paternity"—the presumption of paternity and paternity by estoppel. Op. at 180. The Court does hold that the presumption will no longer apply in cases where the policy it embodies would not be forwarded but, with regard to estoppel, today's decision represents no break with prior case law.

I am unable to join in this approach because I believe that both the presumption of paternity and paternity by estoppel should no longer be strictly applied, as they have been in the past. In light of the changed, and increasingly fluid, nature of the family, and the increased rates of divorce and separation, these legal fictions have become less reflective of social reality. They are now more problematic than useful, and more likely to lead to unfair results. Thus, I agree with the Majority that when the reason for a law ceases, the law should also cease, but I do not join in today's decision because, unlike the Majority, I believe that the time has come to take this principle to its logical conclusion in the law of paternity.

I believe that the better course of action in these cases is to allow the trial court to determine paternity on a case-by-case basis, unburdened by the obligatory application of a presumption or an estoppel theory. These doctrines have acted as an obstacle to the discretion of the trial court to order blood testing of the parties, the single most valuable technique available to a court in determining parentage. Abandoning their strict application would remove this obstacle and allow the trial court to order blood testing of both the alleged father and the presumed father. The benefit of this approach is of course that the trial court is not precluded from considering test results representing, in essence, conclusive evidence of

paternity,[1] but is free to acknowledge this evidence, along with such concerns as the maintenance of an existing family unit, if any, and the promotion of the interests of the child, in the course of arriving at an equitable result.

Moreover, I do not believe that abandoning the obligatory application of these two doctrines in favor of the judicious use of blood testing will necessarily result in any more strain on a marriage unit than would, for example, forcing a cuckolded husband, because of the presumption, to care for a child he knows is not his—a situation which would strain both the marriage *and* the husband's relationship with the child. Blood testing would also work to eliminate situations where a man is deceived into believing he is the father and is then made to bear legal responsibility, by reason of estoppel, for a child that is not his.

It cannot be ignored, however, that blood testing impacts on an individual's right to privacy and therefore may not be compelled without a balancing of the privacy interests of the one whose blood sample is sought as against the needs and interests of those seeking the test. *See John M. v. Paula T.*, 524 Pa. 306, 316–17, 571 A.2d 1380, 1385, *cert. denied,* 498 U.S. 850, 111 S. Ct. 140, 112 L.Ed.2d 107 (1990); *see also Commonwealth v. Sell,* 504 Pa. 46, 470 A.2d 457 (1983). The "good cause" requirement found in Pa. R.C.P. 4010(a) embodies this type of balancing.[2] Rule 4010(a) states:

When the mental or physical condition (including blood group) of a party, or of a person in the custody or under the legal control of a party, is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a physician or to produce

[1]. Blood tests have been held to be less than 100% certain. *See John M. v. Paula T.,* 524 Pa. 306, 316, 571 A.2d 1380, 1385, *cert. denied,* 498 U.S. 850, 111 S.Ct. 140, 112 L.Ed.2d 107 (1990); *Smith v. Shaffer,* 511 Pa. 421, 515 A.2d 527 (1986). Despite this, I would suggest that they are extremely probative.

[2]. "Good cause and notice are intended to protect parties against undue invasion of their rights to privacy." Pa. R.C.P. 4010, Explanatory Note (2); *see McGratton v. Burke,* 449 Pa.Super. 597, 601–02, 674 A.2d 1095, 1097 (1996).

for examination the person in his custody or legal control. The order may be made only on motion for good cause shown and upon notice to the person to be examined....

Pa. R.C.P. 4010(a).

I believe this "good cause" requirement provides a workable standard to guide a court's determination whether to compel blood testing.[3] "[T]he requirement ... is not met by mere conclusory allegations of the pleadings or by mere relevance of the physical or mental condition to the case, but rather, requires an affirmative showing by the moving party that good cause exists for ordering the examination." Goodrich Amram 2d § 4010(a):10, *quoted in Uhl v. C.H. Shoemaker & Son, Inc.*, 432 Pa.Super. 230, 239 n. 1, 637 A.2d 1358, 1363 n. 1 (1994) (Beck, J., dissenting); *see also Schlagenhauf v. Holder,* 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964) (discussing the "good cause" requirement of Fed.R.Civ.P. 35, from which Pa. R.C.P. 4010 is drawn). If good cause is shown for the testing of either the alleged or the presumed father, I believe that he should be tested, despite the presumption of paternity or the presence of facts suggesting a finding of paternity by estoppel.[4]

3. Authority to compel blood testing is also found in section 5104(c) of the Uniform Act on Blood Tests to Determine Paternity, 23 Pa. Cons. Stat. § 5104 (1991). Section 5104(c) states in relevant part:

[i]n any matter ... in which paternity ... of a child is a relevant fact, the court, upon its own initiative or upon suggestion made by or on behalf of any person whose blood is involved, may or, upon motion of any party to the action ..., shall order the mother, child and alleged father to submit to blood tests.

This section authorizes the testing of an alleged father, but has been interpreted as affording no right to the alleged father to compel the testing of the mother's husband—the presumed father. *See John M. v. Paula T.,* 524 Pa. 306, 315, 571 A.2d 1380, 1385, *cert. denied,* 498 U.S. 850, 111 S.Ct. 140, 112 L.Ed.2d 107 (1990). Because I believe that such presumptions should no longer be applied in strict fashion in the law of paternity, I believe Rule 4010(a) provides the better standard for determining whether blood tests should be ordered. The Rule can be applied uniformly, and its requirements recognize and protect individual privacy interests.

4. I would allow testing not only to identify a man as the biological father, but also to show that a man could not be the father. In other words, blood testing is as probative of a lack of biological connection as

Abandoning the strict use of these doctrines would allow our courts to examine the situation presented, to compel blood testing if the appropriate showing is made, and to weigh the competing factors in order to reach a just result in each case. Given the realities of marriage, separation, and divorce today, I believe a flexible, case-by-case approach to paternity issues, acknowledging and benefitting from the relative certainty of blood testing, is simply more preferable than a system characterized by the strict application of overarching and outdated legal fictions that can lead, as the Majority admits, to unfair results.

Thus, I would also remand this case to the trial court, but for blood testing, not a hearing on estoppel. Since Audrianna was conceived while the Brinkleys were married, and because good cause exists, it would seem reasonable to test George Brinkley first. If he is Audrianna's father, the case would end. If he is not, Richard King should then be tested. If Mr. King is shown to be Audrianna's biological father, I believe, given the facts of this case, that he should then be made her legal father.

It is true that in some cases the answers provided by blood testing will perhaps not be easy for all parties to accept. Despite this, it is my belief that the clarity and finality provided by a case-by-case approach involving blood testing outweigh this concern and make such an approach more desirable than the current system. Accordingly, I am unable to join in the language of the Majority's decision, but I do join the Court's remand.

NEWMAN, Justice, concurring and dissenting.

I concur in the Majority's conclusion that the presumption of paternity does not apply to this case, but I write separately to express my view that we must expand the factors available to rebut the presumption, particularly because of the accuracy and reliability of blood testing to determine paternity.

it is of paternity, and I believe it should be employed to establish either status.

I also respectfully dissent from the Majority's decision to remand this case for a determination of the estoppel issue. The evidence clearly indicates that neither the mother nor the husband is estopped from challenging the husband's paternity because neither held Audrianna out as a child of the marriage.

## FACTS

Paternity is a fact-sensitive area of the law. Therefore, emphasizing the relevant facts of this case is important to demonstrate that (1) the presumption of paternity does not apply, (2) estoppel is not a relevant issue in this case, and (3) the next logical step is to perform blood testing to decide whether Richard King (King), the putative father, is Audrianna's biological father.

Both Lisa Brinkley (Lisa) and her now ex-husband, George Brinkley (George) testified that during the time of Audrianna's conception, presumably February of 1991, they did not engage in sexual intercourse. Although they continued to live in the same house, George slept on the couch while Lisa slept in the bedroom. Furthermore, Lisa testified, and King did not deny, that she and King were sexually involved prior to November of 1990 until about June of 1991.

George never held Audrianna out as his child, and King accepted full responsibility for Audrianna as his daughter during the first two years of her life. King was by Lisa's side at the hospital when she gave birth to Audrianna; he paid child support for approximately two years;[1] he visited Audrianna and Lisa regularly; and he included Audrianna on his medical insurance policy. Once Lisa sought a court order

1. Lisa testified that King's wife knew that he was giving Lisa money for child support and that Mrs. King was the person writing the check for the support. King had been giving Lisa $100 per month but when she told him she needed more money to support Audrianna, he refused. Lisa then threatened to take him to court to compel him to give her more money. It appears that Mrs. King then agreed to begin giving Lisa $150 per month, however the payments ceased once Lisa filed the Complaint for Support.

securing the child support payments from King, he denied paternity and refused to support Audrianna.[2]

## PRESUMPTION OF PATERNITY

It has long been the law in Pennsylvania that a child born to a married woman is presumed to be a child of the marriage. *Freedman v. McCandless*, 539 Pa. 584, 654 A.2d 529 (1995). *See also*, 23 Pa.C.S.A. § 5102(b). This presumption arose (a) to protect marital integrity and (b) to prevent a child from being labeled a "bastard" child, a classification that carried both a social and a legal stigma.[3] Modern laws, however, have erased the legal stigma of children born out of wedlock, hence depriving the presumption of one of its original purposes. 23 Pa.C.S.A. § 5102.[4]

**2.** In a collateral matter involving George's obligation to support Audrianna, a Mercer County Court entered an Order on June 20, 1994 (Mercer County order), which concluded, based on DNA and blood tests of Lisa, George, and Audrianna, that George is EXCLUDED as Audrianna's father. Although King was named in that suit, he claims he never received notice of the Complaint or the hearing. The trial court in the case *sub judice* refused to take judicial notice of the Mercer County adjudication.

**3.** As the Honorable Berle Schiller explained in a recent dissenting opinion:

A child protected by legitimacy could inherit from his father, had a legal right of support enforceable against his father and could pursue certain tort actions, such as wrongful death suits. (Fathers benefitted as well, for example, through curtesy, which vested only when a child was born, and through entitlement to children's earnings.) No such rights were available to illegitimate children. They could not inherit from their fathers, were limited to a right to support from their mothers and, in the absence of such support, became wards of the state or church. A child of marriage was also freed from the social stigma of bastardy.

*Ruth F. v. Robert B.*, 456 Pa.Super. 398, 424–26, 690 A.2d 1171, 1184 (1997) (Schiller, J., dissenting).

**4.** In 1971, the General Assembly eliminated the legal distinction between a child born to a married woman, and a child born to an unwed mother by declaring all children legitimate regardless of their parents' marital status. They likewise accorded all children rights and privileges "as if they had been born during the wedlock of such parents." 23 Pa.C.S.A. § 5102. The "presumption of legitimacy" is now referred to as the "presumption of paternity." *John M. v. Paula T.*, 524 Pa. 306, 312–12 n. 2, 571 A.2d 1380, 1383–84 n. 2 (1990).

The goal of protecting marital integrity is also futile in a society where legal marital status does not always translate into a loving, intimate, monogamous relationship.[5] The presumption that a child born to a married woman is a child of the marriage is dubious at best and in many cases, such as here, is absurd. We are living a fable, both morally and legally, if we think that a family is typified by "Father Knows Best," where parents and children love and respect each other and where husband and wife are faithful to each other and adultery is merely a figment of one's imagination.[6] Thus, the presumption that a child born during coverture is a child of the marriage has lost its place in modern society, especially considering the scientific testing available both to prove and to disprove paternity.

The Majority takes the first step today in updating this ancient concept to conform with modern-day realities. Accordingly, I concur with the Majority's holding that the presumption of paternity does not apply where its purpose is not served.[7] However, the time has come to take the next logical

**5.** Divorce, which was once regarded as unthinkable, is now a socially acceptable option for couples with broken marital relationships, as evidenced by the current 51.1% divorce rate. STATISTICAL ABSTRACT OF THE UNITED STATES 1995.

**6.** The conflict between the moral ideals of our society is often demonstrated through the media. For example, in 1992, a controversy arose surrounding the lead character of the popular television show "Murphy Brown." Murphy Brown, a successful, single newswoman, became pregnant, chose not to have an abortion, and decided to have the baby out of wedlock. Despite the television show's presentation of a common situation in our society, some were nevertheless unwilling to acknowledge the frequency with which women are faced with this choice. While some applauded Murphy's decision not to have an abortion, then Vice President, Dan Quayle, criticized the television situation comedy for depicting a scenario that, to him, typified the collapse of the family values in our country. Clearly, we continue to battle the preconception of the typical "traditional" family with the reality of the makeup of the modern family.

**7.** The Superior Court has recently characterized the purpose of the presumption to include protecting an established parent/child relationship, even when the marriage has dissolved. *Dettinger v. McCleary*, 438 Pa.Super. 300, 652 A.2d 383 (1994). I disagree with the Superior Court's expansion of the purpose of the presumption beyond the preser-

step in the evolution of paternity law and expand the means of rebutting the presumption.

Knowledge of biological parentage is of paramount importance for a variety of reasons, including: discovery of genetic medical conditions, especially those conditions that medical science can prevent or successfully treat when discovered at an early stage; satisfaction of a child's innate desire to know his or her biological parents, as we often observe with adopted children; placement of moral and economic responsibility; and preservation of the rights of biological parents. Because of the significance of this determination, a party should not be unnecessarily restricted in his or her attempt to establish paternity. Therefore, I disagree with the Majority's statement that the presumption, when it does apply, may only be overcome with proof of the husband's non-access to the mother,[8] or his inability to procreate. Technology has advanced to a level where blood tests can exclude a man as the father with a 98% degree of reliability.[9] Therefore, when the presumption

vation of the marriage. The nature of the parent/child relationship is addressed and taken into consideration within the realm of estoppel.

**8.** I dispute the Majority's use of a very narrow definition of "non-access" that would essentially require proof that it would have been physically impossible for the mother and her husband to have engaged in sexual relations during the period of conception. This Court has described "non-access" as simply the lack of sexual intercourse. *Cairgle v. American Radiator & Standard Sanitary Corp.*, 366 Pa. 249, 77 A.2d 439 (1951). Furthermore, the Superior Court has stated that "[i]t is not necessary that the possibility of access be completely excluded." *Nixon v. Nixon*, 354 Pa.Super. 232, 237, 511 A.2d 847, 849 (1986). By requiring evidence of physical impossibility of sexual relations, the Superior Court and the Majority seem to have reverted to the ancient standard of proof that the husband was "beyond the seas during the period of gestation." *Cairgle* (citing *Commonwealth v. Shepherd*, 6 Binnney 283 (1814)). I disagree with this strict definition of "non-access" and would hold that evidence of lack of sexual intercourse is sufficient to overcome the presumption.

**9.** Deborah A. Ellingboe, Note, *Sex, Lies, and Genetic Tests: Challenging the Marital Presumption of Paternity Under the Minnesota Parentage Act*, 78 Minn. L. Rev. 1013, 1015 n.12 (April 1994). HLA tests, or human leucocyte antigen tests, compare the blood types of the relevant parties and calculate the statistical probability that a given person is the child's parent as opposed to someone in the general population with the same characteristics. This probability has been referred to as the "parental index." *Reed v. Boozer*, —— Pa.Super. ——, 693 A.2d 233 (1997).

does apply, blood tests should also be available to parties to rebut the presumption of paternity.

The Uniform Act on Blood Tests to Determine Paternity (the Act) expressly permits the use of blood tests in any case where paternity is a relevant issue. 23 Pa.C.S. § 5104. The Legislature adopted the Act because reliable scientific evidence excluding a man as the father of a child is imperative in any suit where paternity is an issue, particularly where the child was born during wedlock. *Tyler v. King,* 344 Pa.Super. 78, 86, 496 A.2d 16, 20 (1985). Section 5104(c) of the Act confers upon the courts the authority to compel interested parties to submit to blood testing as follows:

§ 5104. Blood tests to determine paternity

(c) Authority for test.—In any matter subject to this section in which paternity, parentage or identity of a child is a relevant fact, the court, upon its own initiative or upon suggestion made by or on behalf of any person whose blood is involved, may or, upon motion of any party to the action made at a time so as not to delay the proceedings unduly, shall order the mother, child and alleged father to submit to blood tests. If any party refuses to submit to the tests, the court may resolve the question of paternity, parentage or identity of a child against the party or enforce its order if the rights of others and the interests of justice so require.

The effect of the test results on the presumption is found in subsection (g), which provides:

The HLA blood grouping tests provide circumstantial evidence of paternity whereas DNA test results provide direct evidence of biological parentage, because DNA matches establish affirmative identification of biological parentage. *Reed.See also* Charles Nelson Le Ray, Note, *Implications of DNA Technology on Posthumous Paternity Determination: Deciding the Facts When Daddy Can't Give His Opinion,* 35 B.C. L. REV. 747, 748 (May 1994). Washington County was the first county in Pennsylvania to require buccal swab DNA testing instead of blood testing to determine paternity. The buccal swab is a procedure where a cotton-tipped stick is rubbed between the teeth and inner cheek lining to obtain buccal epithelial cells. These cells are used to conduct DNA testing, which can *affirmatively prove* paternity. *Cable v. Anthou,* —— Pa. ——, 699 A.2d 722 (1997).

(g) Effect on presumption of legitimacy.—The presumption of legitimacy of a child born during wedlock is overcome if the court finds that the conclusions of all the experts as disclosed by the evidence based upon the tests show that the husband is not the father of the child.

23 Pa.C.S. § 5104. The rules of statutory construction, 1 Pa.C.S. § 1501 et seq., dictate that we should give words and phrases in a statute their plain meaning unless they are terms of art. 1 Pa.C.S.A. § 1903. Section 5104(g) clearly and expressly provides that the presumption of paternity is *overcome* if the tests show that the husband is not the father of the child.[10] Yet, Pennsylvania courts have strenuously avoided employing the statute to compel blood tests absent a showing first that the presumption is overcome with evidence of the husband's non-access to the mother during the period of conception or his sterility or impotency.

For instance, the Superior Court has held that where a husband attempts to deny paternity of a child born during wedlock, he may not compel blood testing of himself, the mother and the child without first overcoming the presumption of paternity with common law evidence. *McCue v. McCue*, 413 Pa.Super. 71, 604 A.2d 738, *allocatur denied*, 531 Pa. 655, 613 A.2d 560 (1992). Similarly, in *Scott v. Mershon*, 394 Pa.Super. 411, 576 A.2d 67 (1990), the Superior Court prohibited a mother from compelling blood tests of a third party because she had not first rebutted the presumption of paternity with evidence of her husband's non-access or inability to procreate. *See also Paulshock v. Bonomo*, 443 Pa.Super. 409, 661 A.2d 1386 (1995), *allocatur denied*, 544 Pa. 669, 677 A.2d 840 (1996) (prohibiting the mother from utilizing blood tests that exclude the husband as the father to overcome the presumption of paternity, which also prevented her from presenting evidence of the putative father's probability of

10. We note that this provision permits blood tests to be admitted to *disprove* or exclude the presumed father. After the presumption of paternity is overcome by excluding the husband as the father, then the blood tests can be weighed as part of the evidence to *prove* the paternity of another. *Nixon v. Nixon*, 354 Pa.Super. 232, 511 A.2d 847 (1986); *Turek v. Hardy*, 312 Pa.Super. 158, 458 A.2d 562 (1983).

fatherhood). The courts' threshold requirement of common law proof to rebut the presumption is clearly erroneous pursuant to the Act, which explicitly provides that blood tests are an alternative method of rebutting the presumption. 23 Pa.C.S. § 5104(g).

Furthermore, Section 5104(c) permits "any party" to request blood tests, which would include the mother, the child, the husband or a putative father. Accordingly, a third party who stands outside the marriage and claims paternity of a child born during wedlock is authorized to request blood tests of himself, the child, the mother and the husband to overcome the presumption. In *John M. v. Paula T.*, 524 Pa. 306, 571 A.2d 1380 (1990), this Court, however, denied a third party the ability to compel the husband to submit to blood tests to disprove the husband's paternity. This decision was based on public policy, including the Commonwealth's interest in protecting intact marriages. We stated the following:

> It is true that the Act relaxes the presumption "to some extent" for it explicitly provides that the presumption "is overcome if the court finds that the conclusions of all the experts as disclosed by the evidence based upon the tests show that the husband is not the father of the child." [23 Pa.C.S. § 5104(g) ]. However, the Act does not relax the presumption to the extent that a "putative father," a third party who stands outside the marital relationship and attempts to establish paternity over a child born to the marriage, may compel the "presumptive father," the husband, to submit to blood tests on the strength of such evidence as has been presented herein.

*Id.* at 316, 571 A.2d at 1384–85 (citations omitted). This interpretation is in direct conflict with the plain language of the Act. *See* 23 Pa.C.S. § 5104(c). Moreover, denying a putative father the opportunity to challenge the husband's paternity and establish his own biological parentage, effectively terminates his parental rights without due course of law. *Accord, In re J.W.T.*, 872 S.W.2d 189 (Tex.1994).[11] Because I

11. In *Michael H. v. Gerald D.*, 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989), the United States Supreme Court upheld a Califor-

find that a parent or child's interests in determining paternity outweigh the Commonwealth's unavailing interest in preserving intact marriages, I would hold that, in accordance with the Act, any party to an action in which paternity is a relevant fact may request the court to order all parties to submit to blood tests. These results would then serve to rebut the presumption, irrespective of common law evidence. 23 Pa.C.S. § 5104(c). We would be both naive and remiss to perpetuate the strength of this presumption and ignore the results of reliable scientific tests; especially where, as here, the putative father has admitted to having engaged in sexual conduct with the mother during the period of conception, has accepted the child as his own, and has supported the child for the first two years of her life.

Pennsylvania is fast becoming one of only a minority of states that does not accept the results of blood tests that disprove the husband's paternity to rebut the presumption. Approximately two-thirds of the states currently have statutes permitting blood tests to be considered in the determination of paternity.[12] HOMER H. CLARK, JR., 1 THE LAW OF DOMESTIC RELATIONS IN THE UNITED STATES 340 (2d ed.1987). The United States Supreme Court has accepted the evidentiary value of blood grouping tests to disprove paternity as follows:

> As far as the accuracy, reliability, dependability—even infallibility—of the test are concerned, there is no longer any controversy. The result of the test is universally accepted

nia statute that deprived standing to a putative father to challenge a husband's paternity of a child born to the marriage. Notwithstanding, the Texas Supreme Court recently declared that a statute that prevented a putative father from challenging a husband's paternity was unconstitutional because it deprived him of due course of law pursuant to the Texas Constitution. *In re J.W.T.*, 872 S.W.2d 189 (Tex.1994). Other states are following this trend and expanding the rights of putative fathers to challenge a husband's paternity by establishing their own parentage. *See, e.g.,* Cal. Fam.Code § 7541.

**12.** Of those, at least seven states, including Pennsylvania, have adopted statutes similar to the Uniform Act on Blood Tests to Determine Paternity: California, CAL. FAM.CODE § 7555 (West 1994); Louisiana, LA.R.S. 9:396–398 (1972); New Hampshire, N.H. STAT. § 522:1 (1994); Oklahoma, 10 OK. STAT ANN. § 501–508 (1981); Oregon, ORE. STAT. § 109.258 (1993); and Utah, U.C.A. § 78–25–18, et seq.

by distinguished scientific and medical authority. There is, in fact, no living authority of repute, medical or legal, who may be cited adversely.... [T]here is now ... practically universal and unanimous judicial willingness to give decisive and controlling evidentiary weight to a blood test exclusion of paternity. S. Schatkin, Disputed Paternity Proceedings § 9.13 (1975).

*Little v. Streater,* 452 U.S. 1, 7, 101 S.Ct. 2202, 2206, 68 L.Ed.2d 627 (1981). We should join the majority of states and accept these reliable scientific tests to rebut the presumption that a child born to a married woman is her husband's child.[13]

For example, in *S.E.B. v. J.H.B.,* 605 So.2d 1230 (Ala.Civ. App.1992), the Alabama Supreme Court granted a mother's request to compel her husband and the putative father to submit to blood testing to determine the paternity of a child born during wedlock. In Alabama, the "presumption may be overcome only by clear and convincing evidence that tends to show that it is naturally, physically, or scientifically impossible for the husband to be the father." *Id.* at 1232. Similarly, in Hawaii, a presumptive father may request blood tests to

---

13. Massachusetts has taken one of the more extreme positions in paternity law by eliminating the presumption of paternity in favor of a balancing test. In *C.C. v. A.B.,* 406 Mass. 679, 550 N.E.2d 365 (1990), a putative father alleged that he was the father of a child born to an intact marriage. The Supreme Judicial Court of Massachusetts recognized the conflict between the interests of the putative father and the interest in preserving the legitimacy of the child, and held as follows:

We continue to adhere to the common law principle that motivated the presumption of legitimacy—that there is a strong interest in not bastardizing children. We are no longer convinced, however, that that interest can be protected only by requiring the rebuttal of a presumption by proof beyond a reasonable doubt. In view of the gradual betterment of the illegitimate child's legal position, which weakens the purpose behind the presumption, coupled with the corresponding recognition of the interests of unwed putative fathers, we think that there is no longer any need for a presumption of legitimacy. The interests can be adequately protected by requiring that a putative father in the plaintiff's position be required to prove paternity by clear and convincing evidence.

*C.C.,* at 370. The court further held that, if the putative father could demonstrate a substantial parent/child relationship between himself and the child, he need not disprove the husband's paternity before proving his own. *Id.*

disprove his paternity. *Doe v. Roe,* 9 Haw.App. 623, 859 P.2d 922 (1993). New Hampshire employs a more relaxed presumption of paternity, which "may be rebutted under [ ] common law by satisfactory proof that the husband is not the father," including blood tests, testimony by experts or others, medical or scientific evidence, statistical probability evidence, physical resemblance between the child and the putative father, or acquiescence by the mother and her husband. *Bodwell v. Brooks,* 141 N.H. 508, 686 A.2d 1179 (1996). In Illinois, once blood tests exclude a husband as the father, the court may presume that an alleged father is the biological parent if (1) the blood tests of the alleged father do not exclude him as the father and (2) there is a probability of at least 500 to 1 that he is the father. *People ex rel. Stockwill v. Keller,* 251 Ill.App.3d 796, 191 Ill.Dec. 226, 623 N.E.2d 816 (1993). Utah requires blood tests in any case where paternity is an issue, and the results may conclusively rebut the presumption of paternity. *In re Schoolcraft,* 799 P.2d 710 (Utah 1990). *But see* Colorado—*M.R.D. v. F.M.,* 805 P.2d 1200 (Colo.Ct.App. 1991) (party to the marriage not permitted to challenge husband's paternity beyond the five-year statute of limitations even where a competing presumption arose from blood tests that resulted in a 99.86% probability that the alleged father was the biological parent of the child); and Iowa—*Dye v. Geiger,* 554 N.W.2d 538 (Iowa 1996) (prohibiting an ex-husband from overcoming his presumptive paternity with genetic tests positively establishing another man's paternity when such rebuttal is not in the child's best interest).

California has a more liberal approach and permits the presumed father, the husband, or the child to rebut the presumption with blood test evidence. Cal. Fam.Code § 7541. Interestingly, a man may be a "presumed father" if he satisfies at least one of the following criteria: he and the mother are married at the time of the child's birth; the child is born within 300 days of the termination of the marriage; the couple has attempted to marry before or after the child's birth; or the man receives the child into his home and openly holds out the child as his own. Cal. Fam.Code § 7611.

Pennsylvania's approach to establishing paternity is clearly outdated. The unwavering interests in definitively determining biological parentage mandate that we permit the use of blood tests to rebut the "limited" presumption.

## ESTOPPEL

Regardless of whether a party successfully rebuts the presumption of paternity, or the presumption does not apply, a party may nevertheless be estopped from denying the paternity of the husband if either the mother or the husband holds the child out to be a child of the marriage. *John M.* The theory supporting this concept is that once the husband forms a parent/child relationship with the child, neither he nor the mother should be permitted later to destroy that relationship because of marital discord. *Ruth F.*, at 406–08, 690 A.2d at 1175.

The Majority, however, seems to misunderstand the concept of paternity by estoppel by holding that this case should be remanded to determine whether Lisa is "estopped" from denying her ex-husband George's paternity. Here, neither Lisa nor George ever held Audrianna out to be a child of the marriage. The evidence clearly demonstrates that Lisa never misled George to believe that he was Audrianna's father, nor did she lead anyone else to believe that George was the father. Likewise, George denied his paternity before the child was born, never supported the child financially or emotionally, and never formed a parent/child relationship with the child. Moreover, King, the putative father, accepted the child as his own, paid child support, provided medical insurance, and offered emotional support and parental guidance to Audrianna. It was not until Lisa sought court-ordered support that King denied his paternity. It is clear, therefore, that neither George nor Lisa is estopped from denying George's paternity.

## ESTABLISHING PATERNITY

Therefore, the next step is to establish who is the father. Logic dictates that once a party overcomes the presumption, or the presumption does not apply, the case should be treated

as if the child were born out of wedlock. The paternity of a child born out of wedlock is addressed by 23 Pa.C.S. § 4343, which permits a court to compel genetic testing[14] of any relevant party. Section 4343 states that genetic test results indicating a 99% or greater probability that the alleged father is the biological parent creates an affirmative presumption of paternity that may only be rebutted with clear and convincing evidence that the test results are unreliable.[15] 23 Pa.C.S. § 4343(c). This approach should apply equally to a determination of the paternity of a child born during wedlock where either (a) the presumption does not apply, or (b) the presumption was overcome.

## CONCLUSION

Therefore, I concur with the Majority's decision to the extent that it holds the presumption of paternity does not apply in cases where there is no marital relationship to preserve. However, I dissent from that portion of the Opinion remanding for a determination of estoppel, because I believe

**14.** The Legislature recently amended the definition of "genetic tests" as used in 23 Pa.C.S. § 4343 to include blood tests that confirm or exclude parentage. 23 Pa.C.S. § 4302, *amended,* July 2, 1993, P.L. 431, No. 62, § 1. The Superior Court applied this amendment as follows:

From [the case law], we must accept the higher validity and evidentiary value of DNA testing as a genetic test, and as such, it may be conclusive of paternity. As to HLA and the other blood grouping and typing tests based on genetic markers, these will be considered evidence of paternity which creates a presumption of paternity when the paternity index reaches a level of 99% and is not rebutted by the defendant.

*Reed,* at —, 693 A.2d at 240.

**15.** Currently, to prove a putative father's paternity of a child born during wedlock, the challenging party must first rebut the husband's paternity with evidence of non-access, impotency, sterility or blood tests excluding him as the father. Scientific tests then establish the putative father's paternity. To promote efficiency and reduce the costs, time and effort involved in this determination, I would invite the Legislature to enact a provision that would permit a party to disprove the husband's paternity with evidence that indicates a 99% or greater probability that the putative father is the biological father. Thus, one round of testing of the mother, the child and the putative father could both disprove the husband's paternity, and prove the putative father's parentage.

that there is no such question in this case. Instead, I would remand this case for blood testing of King, Lisa and Audrianna to finally resolve the issue of Audrianna's biological father.

CASTILLE, J., joins in this concurring and dissenting opinion.