Melissa L. WEIDMAN, Appellant,

v.

Robert J. WEIDMAN Appellee.

Superior Court of Pennsylvania.

Submitted Aug. 19, 2002.

Filed Sept. 26, 2002.

John J. Ferry, Palmyra, for appellant.

William H. Sturm, Myerstown, for appellee.

Before: TODD, J., CERCONE, P.J.E., and CAVANAUGH, JJ.

OPINION BY CAVANAUGH, J.:

¶1 This is an appeal from an order which relieved appellee-Robert J. Weidman from the obligation to provide parental support for a minor child, Xavier Robert Weidman, who was born during the course of the parties' marriage, but who is not the biological son of appellee. The court found that appellee did not have an

ongoing responsibility to support Xavier because appellee acted *in loco parentis* to the child, and that the support provided by him while the parties were an intact family unit could be stopped upon their separation and divorce. The appellant argues that although appellee is not the biological father of Xavier, appellee is estopped from denying paternity due to his conduct. Upon review, we reverse.

¶ 2 The facts, as supported by the record, are that Robert and Melissa Weidman were married on March 20, 1992. A son, Jordan, was born on November 13, 1992. A daughter, Miranda, was born on September 26, 1994. After the births of these two children, appellee underwent a vasectomy on January 20, 1995. Thereafter, appellant conceived Xavier, who was born on September 28, 1998. The parties separated in January, 2000. Appellee sued for divorce in February, 2001, and the decree in divorce was entered on September 28, 2001. There is no dispute that appellee is not the biological father of Xavier.

¶ 3 At the evidentiary hearing conducted pursuant to appellant's petition for support of Xavier, appellee testified to the following, as aptly summarized by the lower court in its opinion:

At the Hearing, Robert testified as to his relationship with Xavier. He stated that he knew as soon as Melissa was pregnant that he could not be the father. Xavier's Birth Certificate and Birth Record from the Good Samaritan Hospital lists Robert as the father. When questioned about this, Robert admitted that he agreed to put his name on these documents because he did not want the other children to ask questions. Robert testified that in the two and a half years that the parties remained married after Xavier was born, he never told anyone that Xavier was his son. He did not correct Xavier when he called him dad-

dy, again, because he did not want the other children to know the difference. Robert did have all three children's names tattooed on his chest. At the Hearing, he testified that he recently had the tattoo of Xavier's name altered.

Robert testified that he did take care of Xavier when he and Melissa were married. He bought him food, clothes and diapers. He fed him, bathed him and changed his diapers. He also testified that he would care for Xavier during the night because Melissa would not get up and do so and that Melissa would go out at night until two or three a.m. and he would watch all three children. Furthermore, he testified that he lost three or four jobs because Melissa would call him while he was at work, and he would have to leave work to take care of the children. As Robert put it, he did not want Xavier to die or be dirty.

Since Robert and Melissa separated, Robert has not visited Xavier nor has Xavier come to Robert's home. Although Jordan and Miranda are covered by Robert's medical insurance, Xavier is not.

Lower court opinion, at 3 (March 22, 2002).

¶ 4 Although Xavier was conceived and born while the parties were married to one another, the rebuttable presumption of paternity is not applicable since they no longer have an intact marriage to be preserved. *Brinkley v. King*, 549 Pa. 241, 701 A.2d 176 (1997); *Tregoning v. Wiltschek*, 782 A.2d 1001 (Pa.Super.2001); *McConnell v. Berkheimer*, 781 A.2d 206 (Pa.Super.2001).

¶ 5 Where the presumption of paternity does not apply, the question of the application of the doctrine of estoppel arises. *Brinkley, supra*, at 180. A (former) husband may be estopped from denying paternity of a child born during a

marriage if either he or his wife holds the child out to be the child of the marriage. *Fish v. Behers*, 559 Pa. 523, 741 A.2d 721, 723 (1999). The doctrine of estoppel will not apply when evidence establishes that the father failed to accept the child as his own by holding it out and/or supporting the child. *Jones v. Trojak*, 535 Pa. 95, 634 A.2d 201, 206 (1993) (quoted in *T.L.F. v. D.W.T.*, 796 A.2d 358, 363 (Pa.Super.2002)).

¶ 6 In finding that the doctrine of estoppel applied, the supreme court in *Fish* considered the following facts as indicia of holding out the child as one's own and/or providing support:

1. Mother assured her husband that he was the child's father;

2. Mother named husband as the father on the child's birth certificate;

3. Child bears husband's last name;

4. Child listed as a dependent on the couple's income tax returns;

5. Child was otherwise treated as a child of the marriage which remained intact until three years after the birth of the child when mother informed husband that he was not the father;

6. Child continues to believe that husband is his father;

7. Father-son relationship formed during first three years of child's life;

8. Following separation, for at least two years, husband continued to treat all three children equally;

9. Mother and husband continued to hold child out to the community as the child of their marriage.

*Fish, supra*, at 723–724.

¶ 7 In *McConnell*, this court determined that the doctrine of estoppel applied against a putative unwed father (appellee) based upon the following:

1. Mother never told appellee that he was the biological father of child;

2. Appellee accompanied mother to hospital for child's birth;

3. Appellee signed acknowledgment of paternity on child's birth certificate;

4. Appellee insisted that child should bear his surname and requested that child be named after him;

5. Appellee resided with mother and child for four months after birth;

6. After separation, appellee continued to visit mother and child and brought child presents;

7. Appellee voluntarily signed a stipulated support agreement for the child;

8. Child continued to call appellee "Daddy."

*McConnell, supra*, at 211.

¶ 8 Holding that a step-mother was estopped from denying the paternity of her former husband, this court in *Tregoning*, found the following facts probative of the issue:

1. Child bore father's last name;

2. Former husband was named as father on birth certificate;

3. Couple lived as family unit with child for two years;

4. Former wife named former husband as father in two support petitions;

5. Child was listed as daughter on father's passport.

*Tregoning, supra*, at 1004.

¶ 9 Looking to the facts of the instant case, we find that the lower court erred in failing to find that appellee was estopped from denying paternity of Xavier. There is no issue of fraud by the mother since appellee testified that he always knew that Xavier was not his biological son, based upon the facts of his vasectomy and the lack of physical resemblance. Appellee treated Xavier from birth until the age of two years as he did his other two

children. Appellee is named as father on Xavier's birth certificate, and Xavier was claimed as a dependent on the jointly filed tax returns while the parties remained married. Appellee provided support and care for Xavier by feeding him, changing diapers, and providing companionship and supervision. Xavier's name had been tattooed on appellee's chest, along with the names of Jordan and Miranda.

¶ 10 In considering all these facts, the lower court determined that appellee acted *in loco parentis* and basically provided the care and attention to Xavier that any infant living in the same household would have required. The court found that appellee had attempted to do the "right thing" by accepting Xavier while trying to maintain the family unit. However, based upon the pertinent Pennsylvania caselaw, as cited above, the extent of appellee's involvement in Xavier's life during his formative first two years precludes appellee from denying paternity. Although mother never attempted to mislead appellee into believing he was the father of Xavier, appellee never believed himself to be the father. He voluntarily accepted Xavier into his family and provided support for him. That appellee never represented to anyone that Xavier was his biological son is not determinative of the issue of estoppel, since even absent a "holding out", the provision of support may warrant application of the estoppel doctrine. As in *McConnell*, appellee only contested paternal status when he decided that he did not wish to provide financial support for the child.

¶ 11 We recognize that there exists a split of authority among other jurisdictions regarding application of the doctrine of estoppel in situations where a husband provides support for an infant child that he knows not to be his issue. The argument against application of estoppel is that it is inequitable to impose upon a man who is not the biological father of a child the permanent and substantial financial burden of support for the child. *See J.C. v. G.C.*, 1998 WL 46652 *4–*5, 1998 Conn.Super. LEXIS 251 *15, No. 0112152 (Conn.Super.Jan. 23, 1998), wherein the court observed:

> The issue in this case really goes to the "desirability of encouraging husbands in this situation...to assume voluntarily support of children without the fear that doing so may obligate them permanently." *K.B. v. D.B.*, 37 Mass. App.Ct. 265, 639 N.E.2d [725,] 729 [(Mass.App.Ct.1994)]. This Court believes that such conduct should be encouraged and concludes that a finding of estoppel would discourage, rather than encourage, individuals such as the Plaintiff from getting involved.

¶ 12 The court then quoted from cases from Wisconsin and Maryland which did not apply estoppel, so as to encourage the voluntary support of nonmarital children.

¶ 13 We conclude that the law in Pennsylvania is not in accord with these cases, since Pennsylvania places the greatest emphasis on the prior conduct of the husband and the effect such conduct has upon the child. The guiding principle in these cases was stated in *Brinkley* as the following:

> If a certain person has acted as the parent and bonded with the child, the child should not be required to suffer the potentially damaging trauma that may come from being told that the father he has known all his life is not in fact his father.

*Brinkley, supra,* at 180 (quoted in *Fish, supra,* at 724).

¶ 14 Based upon the evidence, we conclude that appellee did act as a parent to Xavier and did bond with the child. Therefore, the lower court erred in not

finding that appellee was estopped from denying paternity of Xavier.

¶ 15 Order reversed. Case remanded. Jurisdiction is relinquished.