J-A23031-23

2024 PA Super 23

DAVID J. KISH II

        Appellant

        v.

TAUNA KISH AND MICHAEL KNECHT

:   IN THE SUPERIOR COURT OF
:         PENNSYLVANIA
:
:
:
:
:
:
:
:
:   No. 636 MDA 2023

Appeal from the Order Entered April 20, 2023
In the Court of Common Pleas of Luzerne County Civil Division at No(s):
202300729

BEFORE:   LAZARUS, J., McLAUGHLIN, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.:          FILED: FEBRUARY 12, 2024

Appellant, David J. Kish II ("Appellant"), the presumptive father of C.M.S.K. ("Child"), born in March 2018, appeals from the April 20, 2023 order directing genetic testing.[1] After review, we affirm.

The certified record reveals the following relevant facts and procedural history. Appellant and Tauna Kish ("Mother") were married in July of 2015. They remained husband and wife at all relevant times thereafter, including at the time of Child's birth and at the time of the subject proceeding.[2] *See* N.T.,

_____

[*] Former Justice specially assigned to the Superior Court.

[1] An order requiring blood tests to determine paternity is interlocutory but immediately appealable. *Jones v. Trojak*, 535 Pa. 95, 101, 634 A.2d 201, 204 (1993).

[2] Appellant and Mother shared two older children, A.D. and B.D., ages 11 and 10 at the time of the subject proceeding, both of whom are not subjects of the instant appeal.

4/12/23, at 5-6, 10-11; Plaintiff's Exhibit A (marriage license). Nevertheless, according to Appellant, their marriage was "on and off" during unspecified periods, and Mother did not consistently live with him. **See** N.T., 1/12/23, at 57-58, 63. In 2015 or 2016, Mother began a relationship with Michael Knecht ("Knecht") (collectively, "Appellees"), and they eventually cohabited. **See** N.T., 1/12/23 (Volume 2), at 3-4, 8, 10. Appellant was aware of Mother's relationship with Knecht and that they cohabited. **See** N.T., 1/12/23, at 63-65.

The testimony of Appellant and Knecht conflicted in that they each testified that they lived with Mother throughout her pregnancy and accompanied her to prenatal medical appointments. **See** N.T., 4/12/23, at 10-11, 14, 22; N.T., 1/12/23, at 49, 51, 58; N.T., 1/12/23 (Volume 2), at 8-10. Knecht further testified that he was present for Child's birth and signed paternity paperwork. **See** N.T., 4/12/23, at 22; N.T., 1/12/23 (Volume 2), at 5-6. Significantly, no father is indicated on Child's birth certificate; however, his surname is designated as Knecht. **See** Plaintiff's Exhibit C (birth certificate); **see also** N.T., 4/12/23, at 10; N.T., 1/12/23, at 26, 63, 81. Knecht stated that he drove Mother and Child home from the hospital, and that they resided with him after birth. **See** N.T., 4/12/23, at 22; N.T., 1/12/23 (Volume 2), at 7-8, 13.

Appellant admitted that he was not present for Child's birth and did not sign any paternity paperwork. **See** N.T., 1/12/23, at 58-59. However, he

testified that he drove Mother and Child home from the hospital. Despite stating that Mother and Child resided with him after Child's birth, he acknowledged that Mother had not resided with him for several months at the time and, upon discharge from the hospital, he dropped them off at an apartment where Mother and Knecht had resided. *See* N.T., 4/12/23, at 11-12; N.T., 1/12/23, at 52, 63, 65.

Approximately two or three months later, Appellees, along with Child, were evicted from their apartment. *See* N.T., 1/12/23 at 17-18; N.T., 1/12/23 (Volume 2), at 8. While there is a discrepancy in the record where Mother and Child resided immediately thereafter, it is undisputed that, since approximately May 2019, Child has resided in the home of Appellant's mother, D.K. ("D.K."), along with Appellant and his two older children. *See* N.T., 1/12/23, at 16, 50, 86; N.T., 1/12/23 (Volume 2), at 11. Although Mother was initially present at D.K.'s home at that time as well, she is a drug addict and did not consistently stay in the home. *See* N.T., 4/12/23, at 8; N.T., 1/12/23, at 17, 20, 24, 34-35, 50 ("[Mother] would come and go and maybe show up a month or two later and then come back to see the kids and then leave. . . ."). In September 2019, Mother prepared and executed a document outside of court giving the maternal grandmother temporary custody of Child but noting that he would continue to reside with D.K. *See* N.T., 1/12/23, at 20 ("And this . . . gives temporary custody of [Child] to [the maternal grandmother]. [Child] will remain . . . with [D.K.]. . . .").                    .").

It is important to note that Appellant was a registered Megan's Law offender and was prohibited from being alone with Child.[3] **See id.** at 46, 53, 66-67. According to D.K., she was "always with the child with my son present."[4] **Id.** at 46. As a result, D.K. and the maternal grandmother have essentially been working together to raise Child and his siblings. **See id.** at 21, 75.

In January 2020, Knecht's mother, C.K. ("C.K."), acting *pro se*, initiated a custody action against Appellees, wherein she requested shared physical custody of Child.[5, 6] **See** N.T., 1/12/23, at 99; Complaint for Custody,

_____

[3] In 2013, Appellant pled guilty to 15 charges of child pornography. **See** N.T., 1/12/23, at 12-13, 43-44, 66-67.

[4] At the time of the subject proceeding, Appellant was no longer a registered offender prohibited from being alone with Child. **See id.** at 14, 43, 46, 55. Notwithstanding, D.K. testified that they still abided this restriction. **See id.** at 46 ("He still leaves his bedroom door open like he was told. [C]hild is never . . . left alone with him.").

[5] The Honorable Stefanie Salavantis presided over both the custody and paternity proceedings, which she found to be "inseparable." Trial Court Opinion ("T.C.O."), 6/8/23, at 1 n.3.

[6] In issuing the subject order, the trial court relied upon the record of the underlying interrelated custody matter. As such, on November 17, 2023, this Court directed the provision of the custody record as a supplemental record. **See** *Per Curiam* Order, 11/17/23; **see also Gulentz v. Schanno Transp., Inc.**, 513 A.2d 440, 443 (Pa.Super. 1986) (concluding that Pa.R.A.P. 1926 "provides a basis for the inclusion by the trial court of the judgments in the record. It would also provide a basis for action on the part of this Court to include the relevant documents. In this instance, since the existence and validity of the judgments is undisputed, in the interests of judicial economy such action would be warranted."). The trial court complied.

1/23/20, at ¶ 3. C.K. did not name Appellant as a party to this action and omitted any reference to him in her pleading. Pursuant to agreed-upon order of March 2, 2020, the court awarded Mother primary physical custody and Knecht partial physical custody as agreed upon by Appellees. *See* Order, 3/2/20, at ¶ 5. The court awarded C.K. partial physical custody the second weekend of each month. *See id.* at ¶ 6. In addition, the court awarded Appellees shared legal custody of Child. *See id.* at ¶ 4. Notably, the custody order named Knecht as Child's father. *See id.* at ¶ 2.

In December of 2021, C.K. filed *pro se* a petition to modify the custody order, wherein she requested additional partial physical custody, as well as weekly telephone calls and vacation time. Petition for Modification of Custody, 12/9/21, at ¶ 4. By agreed-upon order of January 26, 2022, the court maintained C.K.'s physical custody award, but also awarded her weekly telephone and/or video communication. *See* Order, 1/26/22, at ¶¶ 8, 12. The court maintained Appellees' legal and physical custody awards, but specifically awarded Knecht custody on the fourth weekend of each month. *See id.* at ¶¶ 5, 6, 7. Like with C.K., the court permitted Appellees to have reasonable telephone and/or video communication with Child. In addition, the court awarded Appellees one separate week of vacation with Child. *See id.* at ¶¶ 11, 15. Again, the order identified Knecht as Child's father. *See id.* at ¶ 2.

Then, on January 5, 2023, D.K. and the maternal grandmother, *pro se*, filed a petition seeking to, *inter alia*, intervene in the custody action and join Appellant as an additional defendant.[7]  At a hearing on January 12, 2023, the trial court heard testimony from witnesses including D.K., Appellant, the maternal grandmother, C.K., and Knecht.

D.K. and the maternal grandmother testified that they did not know that Child was the subject of a custody action involving Knecht and C.K.  Both however admitted that they were aware that Mother had attended court on multiple occasions related to Child.  **See** N.T., 1/12/23, at 37-41, 76-79.  In fact, D.K. drove Mother twice and attempted to participate on one occasion.  **See id.** at 37-40.  Appellant likewise acknowledged that he was aware that Mother attended court related to Child and was aware of an order affording C.K. custodial time.  **See id.** at 67-69.

As further recognized by Appellant, D.K., and the maternal grandmother, C.K. has regularly exercised her custodial time in conjunction with D.K. and the maternal grandmother.  **See id.** at 41-42, 69-73, 78-79, 88-89.  C.K. further revealed that Knecht saw Child during her custodial time.  **See id.** at 90-91.

---

[7] C.K. additionally filed, *pro se*, a petition for special relief as a result of Appellant's Megan's Law status on this date.

On January 17, 2023, the court issued an order holding all requests in abeyance pending a determination of paternity. *See* Order, 1/17/23. In so doing, the court stated:

> At present, the court is unable to issue a ruling on the pending petitions due to the fact that no legal determination has been made regarding paternity. Either potential father may file the appropriate petition with the court regarding the issue of paternity. Once that determination has been made, the court shall issue a ruling with regard to the pending petitions for special relief.

*Id.* at 2 n.1 (cleaned up).

In its opinion pursuant to Pa.R.A.P. 1925(a), the trial court explained the genesis of the subject proceeding, as follows.

> On January 17, 2023, [Appellant] filed the instant complaint in paternity seeking an order establishing him as the father of [Child] under the theories of presumption of paternity and paternity by estoppel. In his complaint, Appellant names [Knecht] as an individual who has made claims of paternity. A hearing was held before [the] court on April 12, 2023, wherein [Appellant] and [Knecht] both offered testimony. [Mother] failed to appear at the April 12, 2023 hearing, despite proper service.

T.C.O. at 1 (cleaned up) (footnotes omitted). In fact, according to Appellant, Mother's whereabouts were unknown at the time, and he further alleged that she is a heroin addict. *See* N.T., 4/12/23, at 8.

Appellant testified that Child was conceived and born during his marriage to Mother, and that he had access and is not sterile. *See* N.T., 4/12/23, at 5-6, 10-12, 14-15. He stated that he has fulfilled all parental duties to Child throughout his life, and that Child refers to him as "Dad." *See id.* at 12, 15; *see also id.* at 14-15 (financial support); *id.* at 13-14 (joint tax returns); *id.* at 17 (health insurance); *id.* at 18 (baptism). Appellant further

testified that he was not made a party to and not aware of the nature of the underlying custody proceeding until recently. *See id.* at 19.

In support of his belief that he is Child's father and request for genetic testing, Knecht attested, "I know I'm the father because he looks just like me, and I was at all the doctor visits. I was there when he was born. I took the picture of his weight. I drove them home because him and her lived with me." *Id.* at 22.

By order dated and entered April 20, 2023, the trial court ordered Appellant and Knecht to undergo genetic testing in order to establish Child's paternity. The court further directed such testing be private with Knecht responsible for the costs thereof. As set forth in its Rule 1925(a) opinion, the court concluded as follows:

> Therefore, based upon the court's review of the totality of the circumstances in this case, it is in Child's best interest that a genetic test be done to determine paternity, and for the accompanying custody case to proceed forward once that determination has been made. This court additionally stresses that it is not in any way making any decisions regarding the custody and visitation of any party with the minor child at this time.

T.C.O. at 15.

Appellant filed a timely notice of appeal on April 25, 2023. Pursuant to order of April 28, 2023, the trial court granted Appellant's motion for stay pending appeal. Thereafter, by order of May 1, 2023, the trial court directed Appellant to file a statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b), and Appellant timely complied. *See In re K.T.E.L*, 983

A.2d 745, 747 (Pa.Super. 2009) (holding that the failure to file a concise statement of errors complained of on appeal **with** the notice of appeal will result in a defective notice of appeal, to be disposed of on a case-by-case basis); **Cf. J.P. v. S.P.**, 991 A.2d 904 (Pa.Super. 2010) (appellant waived all issues by failing to timely comply with the **trial court's** direct order to file a concise statement). The trial court filed a Rule 1925(a) opinion on June 8, 2023.

On appeal, Appellant raises the following issues for our review:

A. Did the trial court err by ordering genetic testing to determine paternity when Appellant put forth evidence at trial to establish that he is the father, and where "Paternity by Estoppel" is operative, rendering blood tests irrelevant?

B. Did the trial court err [by] failing to determine that Appellant is the father of the subject child, considering the overwhelming evidence at trial and the best interests of the child?

Appellant's Brief at 9 (suggested answers omitted) (footnotes omitted).[8]

We review for an abuse of discretion the trial court's orders granting genetic paternity testing. **Vargo v. Schwartz**, 940 A.2d 459, 462 (Pa.Super. 2007).

An abuse of discretion exists if the trial court has overridden or misapplied the law, or if there is insufficient evidence to sustain the order. Moreover, resolution of factual issues is for the trial court, and a reviewing court will not disturb the trial court's findings if they are supported by competent evidence. It is not

---

[8] Knecht failed to file a brief in support of his position with this Court. Mother submitted a letter to this Court dated July 31, 2023, indicating her agreement with and incorporating Appellant's brief. **See** Letter in Support of Brief, 7/31/23.

enough [for reversal] that we, if sitting as a trial court, may have made a different finding.

*Id.* (citing ***Doran v. Doran***, 820 A.2d 1279, 1282 (Pa.Super. 2003) (internal citations omitted)).  "The finder of fact is entitled to weigh the evidence presented and assess its credibility."  In so doing, the finder of fact "is free to believe all, part, or none of the evidence and [we as an appellate court] will not disturb the credibility determinations of the court below."  ***Vargo***, 940 A.2d at 462 (citation omitted).

With his issues on appeal, which we address together as they are interrelated, Appellant challenges the trial court's order of genetic testing.  He essentially argues that the evidence established his paternity based upon the doctrines of presumption of paternity and/or paternity by estoppel, and that genetic testing is, therefore, irrelevant.  ***See*** Appellant's Brief at 15-21.  Examining both doctrines, Appellant then proceeds to argue that the trial court erred by failing to determine that he is Child's father, "considering the overwhelming evidence at trial and the best interests of the child."  ***Id.*** at 22.

The legal determination of the paternity of a child conceived or born during a marriage derives from the common law.

> [F]irst, one considers whether the presumption of paternity applies to [the] particular case.  If it does, one then considers whether the presumption has been rebutted.  Second, if the presumption has been rebutted or is inapplicable, one then questions whether estoppel applies. Estoppel may bar either a plaintiff from making the claim or a defendant from denying paternity.

***N.C. v. M.H.,*** 923 A.2d 499, 502–503 (Pa.Super. 2007) (quoting ***Brinkley v. King***, 549 Pa. 241, 250, 701 A.2d 176, 180 (1997) (plurality opinion)).

Under the law of presumptive paternity, "[G]enerally, a child conceived or born during the marriage is presumed to be the child of the marriage; this presumption is one of the strongest presumptions of the law of Pennsylvania; and the presumption may be overcome by clear and convincing evidence. . . ." ***Brinkley***, 549 Pa. at 248; 701 A.2d at 179. This presumption however applies only where the underlying policy of the presumption, *i.e.*, to preserve marriages, would be advanced by its application. ***Id.*** at 250-51, 701 A.2d at 181. It is well-settled that the presumption of paternity is inapplicable when there is no longer an intact marriage to preserve. ***Fish v. Behers***, 559 Pa. 523, 528, 741 A.2d 721, 723 (Pa. 1999).

Instantly, Appellant suggests an intact marriage existed at the time of Child's birth as well as at the time of the subject proceeding. He highlights that he and Mother were married; he was not sterile; and he had access to Mother. ***See*** Appellant's Brief at 23. Notwithstanding, the record supports the trial court's finding that Appellant's and Mother's marriage was "clearly not an intact marriage presently." T.C.O. at 8. While Appellant and Mother remained married, Appellant stated that, at the time of the subject hearing, he was not residing with Mother. ***See*** N.T., 4/12/23, at 4-5. He acknowledged that he was unaware of where she currently resided due to her ongoing drug addiction. ***See id.*** at 8. Further, at the January 2023 hearing in the

- 11 -

underlying custody matter, Appellant recognized the unstable nature of his relationship with Mother, admitting that they were on and off and had indeed separated for an unspecified period. *See* N.T., 1/12/23, at 57-58 ("For a time we did[,] I guess, stop seeing each other. . . .[I]t's kind of been an on and off thing since it first happened.").

Moreover, Appellant concedes that the presumption of paternity is without merit inasmuch as his marriage is not intact. *See* Appellant's Brief at 23. In the alternative, Appellant focuses his argument with respect to the doctrine of paternity by estoppel.

In *Fish*, the Court explained:

> Estoppel in paternity actions is merely the legal determination that because of a person's conduct (e.g., holding out the child as his own, or supporting the child) that person, regardless of his true biological status, will not be permitted to deny parentage, nor will the child's mother who has participated in this conduct be permitted to sue a third party for support, claiming that the third party is the true father. [T]he doctrine of estoppel in paternity actions is aimed at "achieving fairness as between the parents by holding them, both mother and father, to their prior conduct regarding the paternity of the child."

*Fish*, 559 Pa. at 528, 741 A.2d at 723 (quoting *Freedman v. McCandless*, 539 Pa. 584, 591–92, 654 A.2d 529, 532–33 (1995)).

The doctrine of paternity by estoppel

> is based on the public policy that children should be secure in knowing who their parents are. If a certain person has acted as the parent and bonded with the child, the child should not be required to suffer the potentially damaging trauma that may come from being told that the father he has known all his life is not in fact his father.

- 12 -

*Fish*, 559 Pa. at 530, 741 A.2d at 724 (quoting *Brinkley*, 549 Pa. at 249-50, 701 A.2d at 180). In *K.E.M. v. P.C.S.*, 614 Pa. 508, 529, 38 A.3d 798, 810 (2012), the Court held, "paternity by estoppel continues to pertain in Pennsylvania, but it will apply only where it can be shown, on a developed record, that it is in the best interests of the involved child."

It is well-settled that, "before an order for a blood test is appropriate to determine paternity the actual relationship of the presumptive father and natural mother must be determined." *Jones*, 535 Pa. 95 at 105, 634 A.2d at 206 (citation omitted). As the Court stated in *Fish*, "where the [estoppel] principle is operative, blood tests may be irrelevant, for the law will not permit a person in these situations to challenge the status which he or she has previously accepted." *Fish*, 559 Pa. at 529, 741 A.2d at 723 (citation omitted).

Appellant asserts that, in the case *sub judice*, the evidence established paternity by estoppel. *See* Appellant's Brief at 29-35. He maintains that Child has resided with him and his two older children since birth. *See id.* at 29-30. He asserts that he is Child's sole father-figure and has provided for Child and held Child out as his son. *Id.* at 30-31. For example, Child celebrates birthdays and holidays with Appellant; Appellant is noted as Child's father with Child's medical providers; Appellant has claimed Child as a dependent on his joint taxes with Mother; and Appellant was recognized as Child's father at Child's baptism. *See id.* at 31-32. Conversely, Appellant argues that Knecht

"has not been a part of [C]hild's life, never exercised any visitation, sent birthday cards or anything." *Id.* at 30-31. Appellant contends that Knecht indicated that he was sterile[9] and has not been involved with Child. *See id.* at 33. As such, Appellant states:

> Clearly the best interests of this child would be to remain in the home with his closely bonded siblings, and with Appellant as the only father all of the children have ever known, the only father who financially supports them, who takes a real role in their lives, living with them, participating in family functions, taking them to events that are fun – basically being a dad on a day-to-day basis.
> . . .

*Id.* at 34-35.

In finding paternity by estoppel inapplicable and against Child's best interests, the trial court determined that Appellant was not credible. *See* T.C.O. at 14 ("This [c]ourt does not find the testimony of Appellant at the April 12, 2023 hearing to be fully credible."). The court recognized discrepancies as to the actual parental duties performed by Appellant, given the involvement of D.K. and the maternal grandmother. *Id.* at 9-10. Further, Knecht was identified as Child's father in the above-described custody orders and he and C.K. were awarded custody in the underlying custody action initiated in

---

[9] Knecht testified that he thought he was unable have children due to an injury as a teenager. N.T., 1/12/23 (Volume 2), at 10. However, as addressed by the trial court, "at neither hearing was any medical testimony, nor medical documentation, regarding [Knecht's] alleged condition presented to this [c]ourt. Furthermore, there have been many instances of individuals believed to be sterile where pregnancy ultimately does occur. This belief by [Knecht] is not dispositive." T.C.O. at 14.

January 2020. The court therefore concluded that it is unbelievable that Appellant and Mother and their respective families were unaware of this custody litigation but failed to intervene until the maternal grandmother and D.K. filed a petition in January of 2023. The court concluded that it is in Child's best interest to maintain a relationship with Knecht and his family. *See id.* at 11-14. The court reasoned:

> It is completely unbelievable to this [c]ourt that Appellant, Appellant's family, and [Mother's] family had "no idea" about the ongoing custody case and about the fact that [Knecht] has been claiming paternity of [C]hild for several years. The testimony is clear that the family was aware that [Mother] was going to custody court on several occasions, the Knecht family was involved in the case, and the subject of that case was [Child].
>
> Appellant continues to ignore the fact that [C]hild has an established relationship with [Knecht's] family, specifically [Knecht] and [C.K.], who has been having [c]ourt[-]ordered partial physical custody periods with [C]hild one (1) weekend a month for the past three (3) years. [C.K.] testified during the January 12, 2023 hearing that she has had custody of [C]hild one weekend a month beginning in 2020, and that [Knecht] was "supposed to have one weekend a month; he was supposed to have one week vacation in that year; and he's supposed to have phone calls every day." [C.K.] further testified that [Knecht] has seen [C]hild a few times at her home during her custodial periods, and he also celebrates holidays at [her] home with [Child]. [C.K.] testified that her family schedules holidays around the times that [C]hild is in her custody. [C.K.] likewise testified that [C]hild has her husband's middle name, son's middle name, and the Knecht family name. . . .
>
> [C]hild, presently age five (5), has had "Knecht" as his last name since his birth, and the same is reflected on his birth certificate. It is certainly in [C]hild's best interest to maintain a relationship with the Knecht family that he has had consistent phone communication with and monthly weekend custody and holiday visits for the majority of [C]hild's life. The "harm" that Appellant seeks to prevent from occurring to [C]hild has, in fact,

- 15 -

already occurred. [C]hild already has a relationship, albeit a sparse one, with Knecht, and a more developed, regular relationship with [his] family, specifically [C.K.].

*Id.* at 12-14 (citations to record omitted).

Upon review, the record supports the trial court's findings and conclusion that the doctrine of paternity by estoppel is not applicable based on the facts in this case. The evidence reveals a long-standing, established relationship between Knecht and his family and Child, as assented to and supported by Mother and Appellant, as well as their families.

Knecht testified that he and Mother were in a relationship and living together when Mother learned she was pregnant and during her pregnancy. *See* N.T., 1/12/23 (Volume 2), at 3-5, 9-10 ("I was at work, and she sent me a picture of a pregnancy test."). C.K. corroborated same. *See* N.T., 1/12/23, at 93-94, 96. Indeed, she recalled throwing Mother's baby shower. *See id.* at 94. Knecht stated that he went to all prenatal doctor appointments. *See* N.T., 1/12/23 (Volume 2), at 13. Further, he was present for Child's birth and signed paternity paperwork. *See id.* at 5-6.

Notably, Child was given, and his birth certificate denotes, Knecht's last name. *See* Plaintiff's Exhibit C (birth certificate); *see also* N.T., 4/12/23, at 10; N.T., 1/12/23, at 26, 63, 81. Knecht testified to Child having his last

name and middle names associated with him and his family.[10]  N.T., 1/12/23 (Volume 2), at 5.  Knecht explained that, following a prenatal ultrasound, he and Mother had "very extensive conversations about what [Child's] name would be."  *Id.* at 5.  As to its significance, Knecht continued, "His first middle name is my father's first name, and his second middle name is my first name and of course my last name."  *Id.* at 6.  C.K. elaborated that Child's names were revealed as a Christmas present to Knecht's father.  *See* N.T., 1/12/23, at 95.

Thereafter, upon discharge after birth, Knecht indicated that he drove Mother and Child to their shared apartment, where they resided for two to three more months before getting evicted:

Q.  Okay.  When [Child] left the hospital were you there?

A.  Yeah.   I drove them home.

Q.  [Appellant] did not drive them?

A.  Absolutely not.

Q.  Are you positive?

A.  I am 100 percent positive.

Q.  Okay.  Whose car?

---

[10] Interestingly, while conceding that Child has Knecht's last name, the maternal grandmother expressed that Mother wanted Child's last name to be her maiden name.  *See* N.T., 1/12/23, at 80-81 ("[S]he wanted [Child] to [have her maiden name] so all three children would have . . . the same last name.").

A. It was my car.

Q. Okay. Who got the car seat?

A. I did.

Q. Okay. So from the hospital, literally from the room?

A. Yeah. I carried him from the room to the car in the snow and everything. Yeah.

Q. There was snow on the ground?

A. Yep.

Q. You remember that. Okay. Where did you go from the hospital?

A. We went right home, which was our apartment. . . .

Q. How long had you been living together in that apartment?

A. I want to say five months before he was born and then another two or three months after he was born.

Q. Okay. So you lived together there for three more months and then what happened?

A. We got evicted. . . .

N.T., 1/12/23 (Volume 2), at 7-8 (bold omitted). D.K., C.K. and the maternal grandmother all similarly recounted Appellees residing together following Child's birth.[11] *See* N.T., 1/12/23, at 29-30, 82-83, 95-96.

---

[11] The record reveals that Mother's cousin resided at this apartment as well. *See* N.T., 1/12/23, at 63, 82, 95.

Furthermore, Knecht was identified as Child's father in two agreed-upon custody orders resulting from the underlying custody action initiated in January 2020. *See* Orders, 3/2/20 & 1/26/22. Throughout, Mother never challenged this classification of Knecht as father. Knecht testified as follows:

Q. Okay. You were in court in 2020 and 2021 over custody of [Child]?

A. Yeah.

Q. At any point did [Mother] raise the issue of him not being your child?

A. No.

Q. And those two court orders were entered by agreement giving you shared legal custody?

A. Yeah.

Q. Of [Child]?

A. Me and her agreed to everything.

N.T., 1/12/23 (Volume 2), at 9 (bold omitted).

Similarly, C.K. stated:

Q. [O]n January 23, 2020, do you remember filing for custody?

A. Oh, yes.

Q. And you filed for custody against who?

A. Against [Appellees].

Q. Okay. You showed up for custody in this building?

A. That's correct.

Q. When you showed up, did [Mother] make any argument at all that you did not have the right to ask for custody of [Child]?

A. No, none.

Q. Did she raise the issue that potentially [Knecht] was not [Child's] father?

A. No.

Q. The [o]rder that was generated, was that generated by agreement?

A. Yes.

Q. So that agreement was between who?

A. [Appellees].

Q. And you?

A. Yes.

Q. Okay. And you have been to court more than once?

A. Yes.

Q. How many more times did you come back?

A. The year after.

. . .

Q. That was the second time you were court?

A. That's correct.

Q. Did she raise any issues about your son not being the father at that point?

A. No.

N.T., 1/12/23, at 99-100 (bold omitted).

Despite testifying during the custody hearing that they did not know that Child was the subject of a custody action involving Knecht and C.K, both D.K. and the maternal grandmother admitted knowledge that Mother attended court multiple times related to Child. **See id.** at 37-41, 76-79. Indeed, D.K. drove Mother twice and actually attempted to participate on one occasion. She testified, "We tried -- we tried going into -- tr[ied] to tell him that we have the paperwork for [Child] with all the facts, the marriage license, and everything else. We were not allowed in the courtroom. We were not called in to testify. They told us we would be called in as witnesses and we never were." **Id.** at 37-40

Additionally, contrary to claims at the subject proceeding of only recent knowledge of the extent of the underlying custody proceeding, **see** N.T., 4/12/23, at 19, at the January 2023 custody hearing Appellant conceded that he was aware that Mother attended court related to Child and was aware of an order affording custodial time to C.K., **see** N.T., 1/12/23, at 67-69. Thus, this belies any assertions of ignorance.

Moreover, and as noted *supra*, pursuant to these agreed-upon orders, C.K. was awarded and entitled to partial physical custody the second weekend of every month as well as phone calls, which she exercised in cooperation with D.K. and the maternal grandmother. **See** Orders, 3/2/20 & 1/26/22; N.T., 1/12/23, at 41-42, 78-79, 88. Appellant, D.K., and the maternal grandmother all conceded that C.K. engaged in regular custodial time with Child, with C.K.

- 21 -

retrieving Child from the maternal grandmother. *See* N.T., 1/12/23, at 41-42, 69-73, 78-79. D.K. testified:

> Q. Okay. You are aware, are you not, that [C.K.] has been taking [Child]?
>
> A. Yes. I drop him off.
>
> Q. You drop him off?
>
> A. I drop him off to [the maternal grandmother]. I do after school and when she's supposed to have him.
>
> Q. Okay. How often has she been seeing him?
>
> A. She gets him at least one weekend out of the month and she gets phone calls. If we need to change, it we let her know. Sometimes she changes with us and we change with her. . . .

*Id.* at 41-42; *see also id.* at 78-79.

C.K. testified that Knecht saw Child during her custodial time and holidays. She explained, "Well, [Knecht] saw [Child] a few times at my house on my visitation. [Knecht] has come to Christmases, Thanksgivings. [Knecht] does see -- like, [Knecht] was seeing [Child] at my house on my visitation." *Id.* at 90. She continued, "Like, we schedule our holidays around [Child], so when we -- okay. For Thanksgiving, everybody comes to my house because that's when we have [Child] and that's when we celebrate Thanksgiving, the second weekend of the month unless we switch it around and work with each

other doing that."[12] *Id.* at 90-91. In fact, Knecht stated, "Every chance I get to, I see [Child]." N.T., 1/12/23 (Volume 2) at 12.

To the extent Appellant argues that Knecht failed to present any evidence or rebut Appellant's claims of paternity, *see* Appellant's Brief at 34, this argument is without merit. As aptly stated by the trial court,

> At the outset, the court notes that the various iterations throughout Appellant's concise statement claiming that [Knecht] "presented no evidence, filed no counterclaim or complaint for paternity, and did not dispute any of [Appellant's] evidence" and that [Appellant] provided "unrebutted testimony" that he is the father are patently false. While it is correct that [Knecht] did not file a counterclaim or complaint in paternity, he provided testimony at both the January 12, 2023 and the April 12, 2023 hearings that he believes that he is the father of the subject child for various reasons, testified that there is a current custody action in Luzerne County regarding this child where he is named father, and made an oral request that the court order genetic testing. Additionally, [Knecht] has been named as the father of [Child] in [the underlying custody action] since [January] of 2020, an action to which Appellant was only recently named as an additional defendant, and only because [D.K.] and [the maternal grandmother] sought to intervene in said action. There have been clear paternity claims by both Appellant and [Knecht] since at least January 12, 2023, where both individuals introduced himself on the record as "father" to [Child].

T.C.O. at 9 (unnecessary capitalization omitted).

Based on the foregoing, we discern no abuse of discretion by the court concluding that the doctrine of paternity by estoppel does not apply in this case. Clearly, Child had a relationship with Knecht and his family throughout

---

[12] C.K. testified that D.K. and the maternal grandmother did not permit Knecht to exercise his custodial time as set forth in the order. *See* N.T., 1/12/23, at 88-89.

his life to which Appellant, through his action and inaction, acquiesced. We agree with the trial court that "[Child] is entitled to be a part of his biological [f]ather's family, and to explore his heritage if he chooses to do so. It is in [Child]'s best interest to know, for certain, which of these families that he has relationships with, is his biological family." T.C.O. at 14. Accordingly, we affirm the trial court's order directing genetic testing in order to determine Child's paternity.

Order affirmed.


Judgment Entered.


_____

Benjamin D. Kohler, Esq.
Prothonotary


Date: 2/12/2024